Per Curiam :
This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on June 11,1969. Exceptions to the commissioner’s opinion, findings and recommended conclusion of law were filed by plaintiff. Defendant urged the court to adopt the commissioner’s opinion as its decision in this case. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.
OEINION OE COMMISSIONER
Bernhardt, Commissioner: The issue of dispositive stature in this unduly protracted Government contract case is the validity of a release containing express reservations executed by plaintiff contractor in November 1956 following completion in August 1956 of a dam he built for the Bureau of Reclamation. The finality of the release is so apparent as to obviate a more than cursory recital of the issue-related facts so prolixly established in the accompanying findings, and to permit the omission entirely from such findings of those facts relating to the damage issue despite the wealth of record thereon.[1]
*610 If valid and not waived, the release extinguishes all of plaintiff’s present claims sounding in changed conditions, cardinal change, misrepresentation, erroneous classification of excavated materials, and errors in bid, since none of these are preserved, specifically or inferentially, by the 13 enumerated exceptions to the release. See H.L.C. & Associates, 176 Ct. Cl. 285, 376 F. 2d 586 (1966) and cases cited therein.
After partial correction of obvious errors in plaintiff’s improvidently low bid (findings 5-25), the plaintiff was given notice to proceed in November 1952, reaching substantial completion on August 15,1956, instead of the original completion date of June 25, 1955 (finding 26), the delays being covered by time extensions (finding 64). Radically changed conditions were encountered (findings 28-38), involving not only excessive overruns of excavation and fill material at the main damsite (findings 39-41), but also extraordinarily rough foundation terrain (findings 37-38), which completely disrupted and slowed down plaintiff’s planned work sequence and increased his costs commensurately (findings 50-52), as well as occasioning demands by the contracting officer for acceleration of the work (findings 53-57), including working through the markedly severe winter of 1955-56 at a loss of 45 percent efficiency (findings 58-60). The circumstances were ideal as the basis of a claim under the changed conditions clause of the contract, but such a claim was not presented in season.
On July 6, 1956, the plaintiff, in consideration of the payment of $43,314.39 for certain changes, agreed in writing to withdraw all then pending claims for compensation and to make no new claims for additional compensation on the basis of anything occurring prior to that date (findings 62-64). If this were regarded as a release it could be considered as waived by subsequent conduct of the Government in the release of November 20,1956, which by permitting the noting of extensive exceptions impliedly waived the finality of the July 6 concession by plaintiff. See Winn-Senter Constr. Co. v. United States, 110 Ct. Cl. 34, 65-66, 75 F. Supp. 255, 260 (1948).
On November 20, 1956, the plaintiff, in consideration of the payment of $213,562.60 ($212,319 of which represented *611 10 percent withholdings from progress payments through August 1954 pursuant to Article 16 of the contract), signed an official release form in which he—
* * * remises, releases, and forever discharges the United States of and from all manner of debts, dues, sum or sums of money, accounts, claims, and demands whatsoever, in law or in equity, under or by virtue of the said contract, except contract items and quantities as listed on the reverse side hereof.
The reverse side of the release summarized 13 exceptions totaling $198,633.20, consisting almost entirely of disagreements on specific quantities of excavation and fill identified to specific item numbers in the contract specifications.
It is noteworthy that none of the claims constituting the present action were excepted from the foregoing release. No matter how meritorious may be the claims not excepted by a contractor from the operation of a full, valid release under a Government contract (and we might well feel that certain of plaintiff’s non-excepted claims made here were of intrinsic merit had they been kept alive), they may not be judicially entertained later unless the release be found invalid or waived by subsequent conduct of the Government, both of which grounds plaintiff advances. See J. G. Watts Constr. Co. v. United States, 161 Ct. Cl. 801 (1963). The claim of invalidity of the release is based on alleged economic duress, and on the further ground that since the release was signed pursuant to Article 16 of what the plaintiff considers to be a contract void ab initio, the release itself is ineffectual. Neither argument convinces.
Irrespective of plaintiff’s dire financial predicament (findings 61 and 80), no conceivable economic coercion could invalidate a release where, as here, there is no evidence that plaintiff was restricted in the scope of his exceptions to the release. Cf. Harvey-Whiffle, Inc., v. United States, 169 Ct. Cl. 689, 697-99, 342 F. 2d 48, 53 (1965). For all the record shows the 13 exceptions listed by plaintiff in the November 20, 1956 release which he signed were of his own free choice and represented all of the claims he then considered due him from the Government, even though he may have previously announced his intention to make an extensive claim for his *612 damages due to changed conditions and related delays (finding 61). The time to have reserved such claims was upon the execution of the release, and we cannot passively assume that their reservation in the release would have caused [the Government to deny him the final payment of withheld percentages. Plaintiff’s contentions now urged that he lacked sufficient information at the [time of the release to frame proper exceptions to reserve his present claims, and that he obtained the necessary data only in the course of discovery proceedings in this action, do not excuse his failure to state his exceptions covering his present claims in general terms which would have sufficed the purpose of preserving his right to pursue them. See Ft. Sill Associates, asbca No. 7482, 1963 bca ¶ 3869.
Nor does it appear that any conduct of the Government subsequent to the release constituted a waiver thereof. On August 23, 1957, the Bureau of -Reclamation wrote plaintiff to inquire when he would supply additional data with respect to the items excepted from the release, advising that findings of fact would be issued within 60 days on the basis of available information concerning the excepted claims unless plaintiff filed additional data in the meantime (finding 70). After the Bureau found an additional $530.75 due plaintiff from one of his excepted items, and denied the remaining exceptions in findings issued February 7, 1958, the plaintiff appealed and for the first time on March 3, 1958, made a claim resembling changed conditions in very general terms (findings 72 and 73). Upon forwarding the appeal to the Board of Contract Appeals the Bureau wrote to plaintiff on March 20, 1958, reciting the chronology of events since the November 20,1956 release, and the unsuccessful efforts made by the Bureau to confer with plaintiff concerning the details of plaintiff’s claims, and offering to arrange a meeting to discuss any errors in calculations (finding 74). This letter plaintiff considers to constitute a waiver of the release by the contracting officer because the latter did not complain that the claim of changed conditions made by plaintiff for the first túne in his appeal was improper. However, the tenor of the letter is such that it must be considered to relate only to *613 negotiations concerning the items excepted from the release. An ensuing conference between the parties resulted in supplementary findings by the contracting officer dated November 14, 1958, which found plaintiff to be due an additional $13,558.53 relating to items which had been excepted in the release, but specifically denying plaintiff’s claim for delays because of his failure to except such a claim from the operation of the release (finding 77).
By letter of January 30, 1959, the plaintiff accepted the award of the additional sums as “satisfactory settlement of all claims under the afore-mentioned contract”, except as to plaintiff’s claim made for the first time in his notice of appeal of March 3, 1958, which claim plaintiff reserved and expressed his intention to appeal (finding 78). Plaintiff’s timely appeal on February 28, 1959 to the Interior Department Board of Contract Appeals was dismissed on the Government’s motion on the ground that plaintiff’s claims sounded either in misrepresentation or called for recovery of unliquidated damages, over which the Board had no jurisdiction (finding 79).
This record of events discloses no waiver by the Government of its rights under the release of November 20, 1956. On the contrary, it is quite clear that following the release the Bureau of Reclamation’s sole efforts were directed to negotiating a settlement of those claims which plaintiff had expressly excepted from the release and, furthermore, that the Bureau steadfastly excluded from its consideration any claims by plaintiff which exceeded those which he had reserved from the release. The unilateral action of the plaintiff in making a formal claim for non-excepted items of recovery in no way constitutes a waiver of the release by the Government unless by its conduct the Government indicates a willingness to entertain them regardless of the release.
The plaintiff also contends that the last “release” of January 30, 1959 was invalid due to economic duress, but again the facts disclose no more than that the plaintiff was in desperate financial condition and that his acceptance of an ultimate payment of $14,089.28 in settlement of claims totaling $198,633.20 reserved from the November 20, 1956 *614 release was the product of extensive arm’s-length negotiations and concessions between the parties (findings 75-77). The plaintiff’s letter to the Bureau of Beclamation dated January 30, 1959 (finding 78) acknowledges the outcome of the negotiations to have been a “satisfactory settlement” of all claims which had been excepted from the release of November 20, 1956, and excepted only a general claim for “additional compensation for increased costs on the items stated therein, because these additional quantities extended the performance of the contract beyond the period foreseeable at the date of its execution”. Assuming that this sole exception sounded in delay-damages, there is no indication that plaintiff was prevented from incorporating further exceptions relating to claims for changed conditions, rectification of bid errors, misclassification of excavated material, or misrepresentation, which form the broad basis of the present action, or that he was prevented from excepting those specific items of his basic list of earlier exceptions which were deleted in their entirety from the final settlement. Nor did the unilateral exception by the plaintiff in his final “release” covering a vague delay-damages claim have the effect of reviving such a claim when it was not included in the exceptions to the earlier release of November 20, 1956, and was thereby foreclosed by that release, particularly when the Bureau of Beclamation explicitly disclaimed any responsibility for claims which were not reserved in the November 20,1956 release.
The second ground relied on by plaintiff to invalidate the release of November 20, 1956 (as well as the quasi-releases of July 6,1956 and January 30,1959), is that any release predicated on the terms of a provision in a contract that itself is void necessarily vitiates the release, since the claims supposedly released were claims arising under and by virtue of a contract which never had legal existence. No authority is cited for this novel proposition and it is suspected that none could be, for even if the premise of a void contract were assumed to be correct no reason is apparent why that should affect the voluntary agreement of the parties to give a release of claims arising under a qucmtwm meruit performance in *615 exchange for a valid consideration in the form of payment. In point of fact, however, the premise itself is suspect, for at best the contract awarded plaintiff initially was voidable rather than void (see Dougherty v. United States, 102 Ct. Cl. 249, 259 (1944)), and plaintiff’s proper action would have been to bring an action for rescission. See Alta Elec. & Mech. Co. v. United States, 90 Ct. Cl. 466, 479 (1940). By the act of performance the plaintiff lost his right to rescission (WillistoN ON CONTRACTS, Rev. ed., Vol. V, § 1580), as well as his right to deny existence of the contract.
One of the plaintiff’s several causes of action is for $136,240 consisting of the uncorrected portion of obvious errors in plaintiff’s bid. Findings 5 through 25 explore the details thoroughly and create the distinct impression that, although the release signed by plaintiff on November 20, 1956 bars all legal rights to recovery, there is nevertheless strong moral justification in a non-juridical equitable sense (as defined in Harvey-Whipple, Inc., v. United States, supra), for recognition and repayment of this portion of the claim to plaintiff. So clear are the plaintiff’s moral rights to reimbursement that they prompted the favorable recommendation for recognition by the Under Secretary of the Interior in his letter of July 5, 1960, to the Senate Judiciary Committee (finding 25).
Were this item of claim to still be before the court as a congressional reference claim filed here pursuant to S. Bes. 288, 86th Cong., as authorized by 28 U.S.C. §§ 1492 and 2509 (1958 ed.), it would merit the court’s recommendation to Congress for allowance on non-juridical equitable grounds. However, the court’s order of July 2, 1964, responding to defendant’s motion, dismissed the congressional reference aspect of plaintiff’s claim because of views expressed in the separate concurring opinion in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), leaving the claim with the court solely for the purpose of entering judgment pursuant to 28 U.S.C. §1492 (1958 ed.), since the claim is one lying within the court’s general jurisdiction. On four successive occasions the plaintiff endeavored unsuccessfully to have the court reconsider its order, but in the meantime the court had made its *616 report to tlie Senate and returned the reference papers to the cognizant committee, thus terminating any province for the court at this juncture to make any favorable recommendation for equitable treatment by the Congress.[2]
From a legal standpoint the plaintiff effectively released the Government from liability for any reimbursement claims it may have had, and the petition should be dismissed.
FINDINGS of Fact*
1. At relevant times plaintiff was a partnership consisting of Harold C. Adler and Vera L. Adler, his wife, with its principal place of business presently at Littleton, Colorado. Hereinafter “Adler” shall refer to the individual or the partnership as the context suggests.
2. The case presents certain claims in connection with the construction by plaintiff for the Bureau of Reclamation (hereafter “Bu Bee” shall usually refer to the Denver office of Bu Bee unless the headquarters office in "Washington is specified as “Washington Bu Bee”) of an earth-filled dam called Pactóla Dam, at a site some 13 airline miles west of Bapid City, South Dakota. The principal claims relate to defendant’s failure to fully correct mistakes in plaintiff’s bid, unanticipated subsurface conditions, excavation overruns, disputed excavation classifications, work acceleration, and collateral matters.
*617 3. Pactóla Dam was planned and constructed as an earth and rock-filled dam, about 1,250 feet long at the crest and with a height, as described in the specifications, of approximately 230 feet aboye the lowest foundation. Dikes 1 and 2, 1,500 feet north of the main dam, were 2,160 feet in length and had crests level with the dam crest. Water impounded by the dam was released through an underground outlet works consisting of a concrete-lined tunnel north of the dam and a vertical shaft giving access to water control gates. A concrete spillway bored through rock providing for emergency overflows was located between the dam and Dike No. 1.
4. Adler has had extensive experience in construction work, initially as a young boy serving as a laborer in his father’s construction company, then performing small construction jobs independently in his college years, and later becoming his father’s partner from about 1935 until the father’s death, whereupon Adler continued the business through the contract in suit. Since then his scale of operations has been greatly reduced due largely to the economic and credit consequences of the instant contract performance. Prior to the contract in issue the company performed many heavy construction contracts for Bu Eec, including earthwork and rock structures, canals, dams, siphons, bridges, laterals, and power plants and facilities. Pactóla Dam was by far the largest contract the company had ever undertaken. Bu Eec regarded Adler as a competent and trustworthy contractor.
5. Washington Bu Eec issued an invitation for bids on Pactóla Dam August 26, 1952, with revised bid opening scheduled for September 30, 1952, at Eapid City, South Dakota. The invitation listed 70 items, all but three of them at unit prices. Contract award was required by November 29, 1952. The Instructions to Bidders, which accompanied the invitation but expressly was not to be incorporated in the contract, provided in part as follows:
12. Withdrawal of bids. — Bids may be withdrawn on written or telegraphic request received from bidders pri- or to the time fixed for opening. Negligence on the part *618 of the bidder in preparing the bid confers no right for the withdrawal of the bid after it has been opened.
*****
17. Errors in bid. — Bidders or their authorized agents are expected to examine the maps, drawings, specifications, circulars, schedule, and. all other instructions pertaining to the work, which will be open to their inspection. Failure to do so will be at the bidder’s own risk, and he cannot secure relief on the plea of error in the bid. In case of error in the extension of prices the unit price will govern.
The bid bond which bidders were required to file conditioned the surety’s liability on, inter alia, the contractor not withdrawing its bid within 60 days after bid opening.
6. Prior to bidding, Adler thoroughly explored the entire project site “during practically all the daylight hours” from August 28 through September 3 or 4,1052. Some terrain was relatively smooth but much of it was quite rough, particularly the hills on each side of the damsite which provided Bock Sources A and B. He inspected the drill logs, the Grov-emment’s test pits, and saw a number of drill cores which were largely in a state of disintegration because of their age (taken in 1939) and atmospheric exposure. Bock was in evidence in the shallow creek bottom. As a result of his detailed inspection Adler believed he would be awarded the contract because he was more familiar with it than his prospective competitors whose inspections had been more cursory and who (as he thought) had greater overhead expenses than Adler.
7. On September 30, 1952, bids were opened at Bapid City. Expressed in terms of extending the unit prices to estimated quantities, the 12 bids submitted ranged from Adler’s low bid of $3,761,115 to a high bid of $6,959,509. Bu Bee’s prebid cost estimate was $5,962,341, which was later reduced by $613,000 to $5,349,341 by reducing unit prices on four contract items. Thus, Adler’s bid was $2,201,226 (37 percent) under the original Bu Bee prebid estimate, and was $1,117,361 (23 percent) under the second low bid of $4,878,-476, while it was $2,269,203 (38 percent) under the average of the 11 other bids submitted.
*619 8. Three Government representatives acted as a Board for opening and examining all bids on September 30, 1952. In its written report dated October 1,1952, the Board stated in part as follows:
An examination of the low bid shows prices below the Engineer’s Estimate in practically all items from Item No. 1 through Item No. 42. Particularly drastic reductions are evident in Items 10 through 16. Totals of the amounts in those items produce a reduction of about 30 _ percent below the Engineer’s Estimate, which comprises the bulk of the difference between the low bid and the Engineer’s Estimate. The second low bid, that of the Guy F. Atkinson Company, shows not so drastic reduction in Items 10 through 16, with a considerable increase in price for Item No. 2. The low bidder’s prices for Items 13 through 16, excavation in rock sources “A” and “B”, are of particular concern. Almost certainly the low bidder would have to operate at considerable loss in the performance of that work at the bid prices. Compensating increases are not found in other bid items. A small price reduction is found in the low bidder’s drilling and grouting items. It is known that his prices probably are based on quotations from a former Bureau driller, now engaged in private work, who is thoroughly familiar from past work at the site, with problems of drilling and water testing the foundations there.
It would appear that the total schedule amount shown by the second low bidder approaches the minimum which could be expected from any contractor who expected to make a profit from the work.
* * ¡Jí * *
Recommendation Regarding Award. It is felt by the members of this Board that the low bidder could not complete the work at his bid prices without considerable strain on his financial resources. However, he is known as a conscientious and skillful contractor, and unquestionably would prosecute the work vigorously and in full compliance with the terms of the specifications. It is therefore recommended that award be made to the Adler 'Construction Company of Loveland, Colorado, on its low bid of $3,761,115.00, provided that the company has adequate financial resources and provided that the bonding company furnishing the performance bond is well informed concerning the prices bid in comparison with our estimate and with other low bids.
*620 Because of tlie disparity in Adler’s bid, Bu Bee’s legal counsel advised tlie contracting officer to ask Adler to confirm Ms bid, but tMs was not done.
9. Adler first learned of tbe sharp disparity in his bid by. a telephone call from his employee at the Bapid City bid opening in the afternoon of September ‘30, 1952. Adler had been preoccupied with a time-consuming trial of a lawsuit against his company in Colorado since September 25 wMch had precluded closer attention to the preparation, submission, and opening of Ms bid on the Pactóla Dam contract. Upon learning of the bid disparity he was shocked, and suspected a grave error, but was unable to confer with Bu Bee representatives concerning it until October 7, 1952, when a one-day adjournment in Ms trial involvement provided him with Ms first opportunity to discuss it at Bu Bee offices in Denver.
10. As reflected by a Government memorandum of the October 7, 1952 conference between Adler and Bu Bee officials with respect to the obvious disparity .in Ms bid, Adler informed the conferees that his surety refused to issue a performance and payment bond because of doubts about Ms low bid, and that because of the pressures of his trial then in process he had not yet had an opportunity to review Ms bid, as to wMch “'he may have made a mistake.” Bu Bee officials emphasized the necessity to start performance as soon as possible and invited Adler to request in writing the OMef Engineer to delay contract award for a reasonable period to give Adler time to check Ms bid figures. Adler was advised by Bu Bee representative's to submit Ms bid sheets with a covering explanation of whatever errors he detected, which submission would then be forwarded to the Comptroller General for decision as to whether the circumstances justified a correction of Ms bid. On October 7,1952, following the conference of that day, Adler wrote to the Chief Engineer requesting until October 16 to check his bid for errors and asking that the contract award be deferred until then. He expressed ignorance of the reasons for the wide difference between his bid and those of the next two bidders, and suspected errors in Ms bid. On October 11,1952, Adler received a letter *621 dated October 10 from the Chief Engineer to the effect that “We will withhold making the 'award a reasonable length of time”, recognizing Adler’s inability to avoid his current trial involvement, suggesting a conference with Adler and his surety at the earliest practicable time, and emphasizing the need to start the project as soon as possible.
11. The trial which had preoccupied Adler, since its commencement September 25, 1952, concluded on Saturday, October 11, 1952. On October 13, Adler advised Bu Bee by telephone that he had located some serious errors in his bid, one of which was in the amount of over $300,000, and requested a meeting with the Chief Engineer, Mr. McClellan, who was also the contracting officer, to discuss the errors and ensuing procedures. Later that day Adler was informed that a meeting would 'be held the following day with the contracting officer, as requested. A contemporaneous Government memorandum, possibly more accurate than Adler’s recollection,[1] reflects that Adler was informed by telephone on the morning of October 14 from Bu Bee’s Assistant Chief Construction Engineer that, despite Adler’s objections, the contracting officer was going to award the contract that day, which would not interfere with Adler’s right to apply for a correction of his bid. However, the contracting officer agreed to withhold the award until Adler came in for a conference that afternoon. Adler arrived at the scheduled conference armed with his bid estimate worksheets and details as to arithmetical errors in six principal items, totaling $581,505. He also brought a letter requesting that his bid be rejected, or accepted with corrections, and that contract award be deferred. At the conference Adler explained the errors to the Bu Bee representatives who were present, attributed them to his trial preoccupation since September 25, and 'stated that both (his bank financing and performance bonding were in jeopardy because of his low bid. He was advised by the conferees to submit in affidavit form information as to the errors and how and why they were occasioned, and they would thereupon be transmitted to the Comptroller General for advice as to bid revision, award to the next low bidder, or con *622 ■tract readvertising. Adler was told that “the contractor’s allegation of error Would be the sole item for consideration by the GAO and that the contracting officer would not be in a position to make any recommendations”.
12. During the conference of October 14,1952, referred to in the preceding finding, Adler was purportedly shocked upon being informed that the contract had been awarded to him. A telegram notifying him of the award was stamped as being dispatched from Bu Bee at 3:49 p.m., on that day and received at Adler’s company headquarters in Loveland, Colorado, at 5 p.m., the same day, although Adler denies having been -informed during the meeting that he had been awarded the contract, and avers that he was not aware of it until he arrived at his Loveland headquarters following the meeting. While the dispute is immaterial, the version of the facts presented here is based on a contemporaneous Bu Eec memorandum of the meeting and is preferred to Adler’s recollection, even though none of the Bu Bee representatives who attended the meeting testified at the trial. The resolution of the facts on this point is no reflection on Mr. Adler’s veracity, but merely a preference for a written record of the event over fallible human memory.
13. Whatever inclination Adler may have had on October 14, 1952, to refuse to perform the contract awarded to him that day unless the errors in his bid were corrected was necessarily affected by the awareness that a refusal to perform could have caused cancellation of his bid bond of $367,000 which would, in turn, have jeopardized Adler’s financial condition and deprived him of working capital both for the contract in suit and to finish other contracts which were then nearing completion.
14. On October 15, 1952, the contracting officer confirmed by telegram to plaintiff that any correction in plaintiff’s bid would have to be effectuated by the Comptroller General because the contracting officer lacked such authority, and emphasized the importance that the request be made without delay because of the ten-day period[2] permitted by the con *623 tract for its execution and furnishing of performance and payment bonds. Failure to execute these forms was technical ground for forfeiture of the bid bond.
15. In a sworn statement dated October 18, 1952, Adler submitted to the contracting officer on October 20 a claim of bid errors totaling $621,505, in which he described the errors in his bid on each of seven contract items and enclosed a copy of those of his bid worksheets which were relevant to the claimed errors. These errors may be summarized as follows by contract item numbers:
No. 1, diversion and care of stream, etc. Bid at $45,000 instead of $75,000 due to error in transposing figure from worksheet to bid.
No. 2, excavation of 420,000 c.y. of overburden in open cut. Bid at $147,000 instead of $224,540 due to failure to include in computation the factor of $77,540 for equipment charges as shown on worksheet but not inserted in the total or transferred to bid.
No. 5, excavation of 1985 c.y. all classes. Bid at $45,655 instead of $63,520 due to failure to include in computation the factor of $17,865 for equipment charges as shown on worksheet but not inserted in the total or transferred to bid.
No. 9, excavation of 220,000 c.y. stripping in borrow pits. Bid at $41,800 instead of $51,800 due to simple error in addition on bid worksheet.
Nos. 10 and 11, collectively. Common excavation of 2,000,000 c.y. in upstream borrow area and transportation to embankments. Bid at $520,-000 instead of $880,100 due to failure to include in computation the factors of $311,100 for equipment charges and $49,000 for “margin” as shown on worksheet but not inserted in the total or transferred to bid.
No. 12, common excavation of 700,000 c.y. in downstream borrow area and transportation to embankment. Bid at $175,000 instead of $301,000 due to same oversight as in Items Nos. 10 and 11, on which the computation was based.
These errors were not individually apparent on the face of Adler’s bid, but were readily apparent in Adler’s bid worksheets, which Bu Bee did not have until later, although the *624 disparity between Adler’s bid and the others was enough to excite Bu Bee’s concern, as indicated in findings 8 and 16.
The letter of October 18, 1952, concluded with Adler’s request that he be excused from executing the contract according to the original bid, or that the bid be adjusted to eliminate the errors.
16. On October 31, 1952, the contracting officer wrote a memorandum to the Commissioner of Washington Bu Bee presenting in full detail the circumstances of the plaintiff’s erroneous bid, recommending that the Comptroller General be asked for a decision whether the contractor would be entitled to relief by correcting the bid errors. If so, the contracting officer recommended “that correction be allowed by appropriate reformation of the contract”. The contracting officer expressed the opinion that reformation would be “in accordance with previous decisions of the Comptroller General that the bid can be corrected if the amount of the intended bid can be established”. He advised that readvertisement of the contract would not only result in much higher costs to the Government than if Adler’s errors were corrected, but would also delay completion of the contract for a full season.
17. In the meantime the bid of Guy F. Atkinson Co., the second lowest bidder, contained an acceptance period limitation of 30 days which expired October 30, 1952.
18. On November 3, 1952, the Administrative Assistant to the Secretary of the Interior submitted the contracting officer’s recommendation of October 31, 1952 (finding 16, supra) to the Comptroller General for a decision, with the following comment:
* * * The Chief Engineer [i.e., contracting officer] recommends that, if you conclude that errors entitling the contractor to relief have been made, the contract be reformed accordingly. The Commissioner of Beclamation and I concur in this recommendation as being in the best interest of the Government.
19. Adler was not aware of the communications referred to in findings 16 and 18, supra, until they were produced in the course of discovery proceedings in the instant litigation.
*625 20. On November 14,1952, Adler was advised by telephone from Bu Eec that the Comptroller General had made a decision with respect to his request for bid reformation. The following Monday morning, November 17, 1952, Adler visited Bu Eec in Denver, unaccompanied by counsel. He was informed by Bu Eec representatives that they had learned that a decision had been made by the Comptroller General on November 14, 1952, to the effect that the contract could be amended to correct the errors. Neither Adler nor the Denver office of Bu Eec had the test of the Comptroller General’s decision, and the extent of Bu Eec’s knowledge of its contents is not disclosed. Nor is it known whether Washington Bu Eec had the text of the decision at that time. A protracted conference with Adler was held all during November 17, 1952, at Bu Eec in which the several errors in Adler’s bid were discussed at length. Bu Eec was apparently concerned that Adler’s corrected prices for certain of the erring items was more than the Government’s prebid estimate for the same items or than the bids of several other contractors for certain of the items, which led the Bu Eec representatives at the conference into approving increases in Adler’s defective bid which in the aggregate were $136,240 less than Adler’s claim. The bid invitation itself had provided that “no bid shall be considered for only part of the schedule”. In many other items Adler’s bid was far lower than other bidders, and this was true in the aggregate as well. See finding 7, supra. Upon Adler’s complaint that Bu Eec’s proposal failed to fully rectify what were clearly mistakes in the bid, Bu Eec’s principal negotiator, a Mr. Bloodgood, commented in effect “that’s all we can pay”. Adler was told that no further delay would be allowed and he would have to sign the contract documents immediately, and a notice to proceed must be issued that day. Towards the end of the November 17, 1952 conference an Amendatory Agreement was prepared by Bu Eec and given to Adler to sign. The agreement had not at the time been signed by Bu Eec. Adler testified that he signed it without knowing its contents or being permitted to read it, but there is no credible evidence *626 that Adler demanded an opportunity to read it or was prevented from reading it before signing it, except that the workday was purportedly drawing to a close and the contracting officer was anxious to terminate the conference. Adler was, however, aware that the Bu Sec representatives had reduced his claim of errors by $136,240 and must have been aware of the reasons given for the reduction even though he might not have agreed with them. Adler testified that he signed the Amendatory Agreement under economic duress at a time when he feared that, if he did not sign it together with the contract itself and the supporting performance and payment bonds, his bid bond of $376,111 would be in danger of forfeiture, but by November 17, 1952, the ten-day period for executing the contract on pain of bid bond forfeiture had long since expired and no such action had been taken or threatened by the bonding company so far as the record intimates. The facts in this finding are predicated in part on Adler’s testimony and in part on documentary evidence. No testimony was offered by Bu Bee officials attending the November 17 conference.
21. The Amendatory Agreement signed by the parties on November 17, 1952, which Adler contends as stated above is void because of unlawful duress and lack of consideration, provided in part as follows:
whereas, the Comptroller General of the United ■States, upon the basis of evidence furnished by the Contractor, has ruled (copy of decision attached hereto as Exhibit A) that there were mistakes in the Contractor’s bid, and that since the 'bid, if corrected in the full amount of all mistakes, would still be the low bid, it can be reformed by the contracting officer to correct said errors; and
whereas, the contracting officer is willing to agree to reformation and to proceed with the contract only on the basis that where correction of the mistake or mistakes as to any item results in a unit or lump sum price in excess of a conservative and fully justifiable price, the unit or lump sum price as reformed will not exceed said conservative and fully justifiable price, which principle is acceptable to the Contractor; and
*627 whereas, reformation of the contract as hereinafter provided is hereby determined to be advantageous to the Government both because it will permit immediate commencement of work on an urgently needed project to supply water to the Eapid City Air Force Base, and because the contract as reformed will result in a cost to the Government of $1,715,961 lower than the Government’s original cost estimate and $632,096.50 lower than the next low ibid.
now, therefore, the parties hereto mutually agree as follows:
1. The respective unit prices for Items 1,2, 5,9,10,11, and 12 are hereby deleted from the schedule of Specifications No. DC-3783 and the contract is hereby reformed ■by substitution of unit and extended prices for said items as follows:

Item Work or material No. Quantity ani price Amount

1_Diversion and care of stream during construction & un-watering foundations. For the lump sum of _Sixty thousand (words) 00/100 dollars . $60,000.00
2....Excavation, overburden, in open cut 420,000 cu. yds., at Fifty-three cents (words) ($0.53) per cu. yd. 222,600,00
6.Excavation, all classes, in tunnel and gate chamber 1,985 cu. yds., at Thirty-two dollars (words) ($32.00) per cu. yd. 63,520.00
9...Excavation, stripping borrow pits 220,000 cu. yds., at Twenty-three oents (words) ($0.23) per cu. yd. 50, 600.00
10.Excavation, common, in upstream borrow area & transportation to embankments, first 1,000,000 cubic yards 1,000,000 cu. yds., at Forty-two oents (words) ($0.42 per cu. yd. 420,000,00
11..Excavation, common, in upstream borrow area and transportation to embankments, over 1,000,000 cubic yards 1,000,000 cu. yds., at Thirty-seven cents (words) ($0.37) per cu. yd. 370,000.00
12.Excavation, common, in downstream borrow area and transportation to embankments 700,000 cu. yds., at Thirty-nine cents (words) ($0.39) per cu. yd. 273,000.00
The increases in unit and lump sum prices as above provided result in an increase of $485,265 in the total amount of the contract 'based upon the estimated quantities stated in the schedule.
*628 2. In. consideration of the Government’s waiving its right to rescind the contract, the Contractor hereby accepts the foregoing reformed unit and lump sum prices in full satisfaction of all of its rights arising out of or in any way connected with mistakes in its bid, notwithstanding the fact that the unit and lump sum prices stated in Article 1 hereof in several cases do not reflect increases equal to the full amount of the errors claimed by the Contractor and found by the Comptroller General.
The amounts set forth in the foregoing excerpts from the Amendatory Agreement may be compared with the summary in finding 15, supra, which recites Adler’s bid for each disputed item and his correction request. Unit price references are omitted as unnecessary.
22. Although the Amendatory Agreement of November IT, 1952, refers in the “whereas” clauses to the parties having “heretofore entered into” a contract for Pactóla Dam, and to a copy of the Comptroller General’s decision as being attached as Exhibit A, at the time the Amendatory Agreement was signed on November IT, 1952, the parties did not have possession of the Comptroller General’s decision, and Adler did not sign and deliver the contract itself until immediately following the signing of the Amendatory Agreement, but did so prior to leaving the conference. Adler did not receive a copy of the Amendatory Agreement of November IT until November 28,1952, but there is no evidence that he demanded it earlier. Also, while the concluding “whereas” clause of the Amendatory Agreement refers to the fact that the revised contract price was lower than the next lower bid by $682,096.50, in fact the next lower bid had expired by its own terms prior to October 31,1952, and hence was no longer available. See finding IT, supra.
23. On or about November 28, 1952, Adler received for the first time a copy of the November 14, 1952, decision by the Comptroller General which held in part as follows:
On the basis of the facts and evidence of record there appears no doubt that errors were made in the bid. Furthermore, the evidence reasonably established that except for the errors the prices for the various items *629 would bave been as alleged. The bid of Adler Construction Company, if it be corrected, is still approximately $500,000 lower than the next-lowest bid received.
It is reported that the project involved was recently approved by Congress for immediate construction in order to make available a much needed water supply for the Sapid City Air Force Base of the Strategic Air Command, and that the work is of a highly urgent nature. It is further reported that any substantial delay in the matter will make it impossible to perform the necessary initial construction work before the onset of winter weather which would result in a full season’s delay in the ultimate date when the water can be furnished to the Sapid City Air Force Base and that, therefore, readver-tisement of the work is not considered to be in the best interests of the Government.
Under ail the circumstances, this Office will not be required to object to the correction of the bid of the Adler Construction Company on items 1, 2, 5, 9, 10, 11 and 12 to the prices hereinbefore set forth and entering into a formal contract with the company on that basis.
The Comptroller General totaled the bid errors to $621,465 instead of Adler’s claim of $621,505, by rounding off to the nearest cent the unit price in several of the items. In its requested findings to this court the plaintiff concedes the slight reduction in the claim by the Comptroller General to be entirely justified.
24 Depending on the construction given to certain cost factors listed in plaintiff’s bid worksheets, at the time he executed the Amendatory Agreement on November 17,1952, increasing his bid by $485,265 to correct errors, Adler could have expected to earn a profit on the contract of $557,696 (according to the Government’s interpretation) or $271,083 (according to Adler’s interpretation), assuming that the cost estimates in Adler’s bid worksheets as corrected were to be experienced in actual performance. All but $10,086 of the difference between these conflicting profit figures depends on the interpretation to be given the plaintiff’s bid worksheets as to whether figures added at the end of cost subtotals for Direct Salaries and Continency for Labor Increase were included in the Margin factor supplied separately in each of *630 the contract items. While the purpose of this finding is to reflect in part the influences which were present when Adler executed the Amendatory Agreement on November 17,1952, it is to be borne in mind that at the same time his bid as corrected was in remaining respects so substantially lower than the nearest competitor’s ($632,096.50 difference) and than the Government estimate ($1,715,961 difference) as to cause a reasonable man to suspect further errors less readily detectable than the seven obvious errors he had already urged.
25. In a letter dated July 5, 1960, from the Under Secretary of the Department of the Interior to the Chairman of the United States Senate Committee on the Judiciary, written in response to the latter’s request for the Department’s views on the then pending private relief bill S. 3199 for the relief of the Adler Construction Company, in the course of recommending relief for one of the three claims (and recommending against the other two) then being made by the contractor which related to rectifying its mistake in bid, the Under Secretary made the following statements of fact and opinion which bear on the contractor’s situation on November 17, 1952, when the Amendatory Agreement was presented to Adler:
It is believed that the Government has technical legal defenses (i.e., statute of limitations and failure to reserve the claim in the contractor’s release on the contract) to the contractor’s claim which would preclude his recovery in the courts. And, apart from the technical defenses, it is doubtful that on the merits the contractor could successfully establish either that duress was involved in securing his consent to the amendatory agreement, or that the amendatory agreement was invalid for lack of consideration. However, the Congress, in certain hardship situations, has granted legislative relief where the applicant does not have a legally enforceable claim but has a claim presenting strong moral and equitable considerations. Considered in this light we are of the opinion that Adler’s claim for relief insofar as claim (a) is concerned, has such compelling considerations of fairness that congressional relief would ’be warranted.
*631 In reaching the above conclusion, a number of considerations are involved. In the first place, Adler was placed in an exceedingly precarious position by the fact that his bid was so very low in comparison with other bids and the engineer’s estimate as to raise doubt as to his ability to perform the contract without ruinous losses. This situation was complicated by the fact that he was involved at the time in litigation from which he was unable to free himself for a sufficient period to give full consideration to the problem. His situation was further aggravated by the fact that there were indications that the bonding company that had furnished his bid bond would not furnish a performance bond to support the contract, and in such event, his bid bond in the amount of $376,000 would have been subject to forfeit. This would have had very serious consequences, in all probability resulting in Adler’s complete financial ruin. Additionally, the Government’s urgent need to get the work under way impelled it to make the rather precipitous award of contract, notwithstanding ¡the fact that Adler had given verbal notice of serious errors in his bid. Although the award was not made with any intention to prejudice Adler’s position, it is obvious that the Government’s necessity dictated a course of action which placed him in a most difficult position.
With regard to the negotiations as a result of which Adler was induced to accept the amendatory agreement, personnel who were present at the meeting recall that Adler appeared in response to a telephone call, and was unaccompanied by legal counsel or associates. He offered no serious opposition to the Government’s proposal and accepted the proposal precisely as it was made. At the time these negotiations took place, it seemed to the Government personnel involved a proper course of action in the discharge of their responsibilities. However, viewed in retrospect, it is considered that they were overly zealous in their desire to safeguard the Government’s financial interests, and that the contractor, subject to such pressures as he was under at the time, had or at *632 least thought that he had almost no alternative to accepting a proposition that was seriously adverse to his interests and one that it is now felt, in good conscience, the Government shouJ d never have made.
Even with Adler’s bid corrected in the full amount of the error found by the Comptroller General, it would still be some $600,000 below the next low bid and approximately $1,100,000, or 25 percent below the revised Government estimate. It is apparent that even with the error as allowed by the Comptroller General, the Government had the advantage of an exceedingly low bid. As a result of performing the contract at the contract price, including the prices in the amendatory agreement, the contractor suffered ruinous financial losses, and he has been forced to sell much of his construction equipment. Since completing the Pactóla Dam job, he has been unable to secure bonds covering jobs of any substantial volume of work, and has been confined largely to subcontracting small jobs from other contractors.
In view of the foregoing, it is the opinion of the contracting officer, in which this Department concurs, that claim (a) submitted by the Adler Construction Co. in S. 3199 contains such elements of equity and fairness that relief legislation to the extent of $136,532.86 is warranted.
26. Notice to proceed was issued on November 17, 1952, thus establishing June 25,1955 as the original contract completion date (950 days). Time for performance was ultimately extended to August 15, 1956. No liquidated damages were assessed, although the prospect existed until late in contract performance (see finding 61, infra).
27. The contract contained the following standard Changed Conditions clause:
Article 4. Changed conditions. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized *633 as inhering in work of tlie character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and/ or difference in time resulting from such conditions.
28. As the work under the project progressed, the plaintiff encountered subsurface or latent conditions at the site of the main dam foundation materially different from those shown in the drawings and specifications which made excavation and refill work much more difficult and costly. Defendant became aware of the conditions as they were uncovered by plaintiff. The conditions to be described in subsequent findings are confined to the foundation for the main dam and, unless otherwise specified, do not relate to other parts of the project.
29. The major claim of the plaintiff is that foundation surfaces acceptable to the Government under the main dam-site were reached at substantially greater excavated depths below original ground surface than the contractor was led to anticipate from his inspection of the site and examination of contract drawings, specifications, and drill logs, and that the foundation ultimately excavated down to “suitable material” as determined by the Government was much rougher and more irregular than the drawings, specifications and drill logs portrayed, or than plaintiff’s thorough prebid-site inspection inferred. It is plaintiff’s contention that the conditions encountered were not only materially different “from those shown on the drawings or indicated in the specifications” (in the language of the Changed Conditions article, supra), but that they also greatly increased his costs by reducing operating efficiencies, requiring additional equipment, prolonging 'the performance period, and requiring unplanned performance under severe winter weather conditions, and that the admitted 261 percent overrun of excavation (and corresponding additional fill) paid for at contract-unit prices did not properly reflect or compensate for the extreme diffi *634 culties and added costs which, the subsurface conditions imposed on performance. In order to place the problem in proper perspective it is first necessary to examine closely the relevant specifications, drawings and drill logs to determine what the plaintiff (and other bidders) could have reasonably anticipated in the way of subsurface conditions to be encountered in the course of excavating foundations for the main damsite.
30. Article 2 of the contract, entitled Specifications and Drawings, provided in part as follows :
* * * Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense. * * *.
31. Paragraph 16 of the Specifications requires that the dam be constructed “in accordance with these specifications and the drawings listed in Paragraph 128 hereof, * * Paragraph 128 includes Drawing No. 494 — D-39, “General Plan and Sections”, which in addition to a general plan drawing of the complete project, contains, inter alia, various detail and section drawings entitled “dam-maximum section,” “profile on center line of cutoff trench-dam”, “concrete cutoff wall”, and “concrete grout cap”, to name a few project features that are relevant to our present inquiry, plus miscellaneous other data as to elevations, camber, reservoir, material legends, dimensional scales, etc. Certain errors and ambiguities in Drawing No. 494-D-39 (hereinafter shortened to Drawing 39), and inconsistencies between the drawing and specifications, constitute the principal basis for plaintiff’s contentions as to Changed Conditions.
32. Drawing 39 contains a profile section drawing entitled “dam-maximum section”. It purports to show a longitudinal cross-section of the main dam perpendicular to the dam axis,
*635 meaning a vertical endwise slice of the dam from its upstream toe to its downstream toe. The witnesses were in marked disagreement as to whether the drawing was designed to provide an actual or merely a theoretical cross-sectional location. If the former, they disagreed as to the location depicted. If the latter, the drawing is not labeled as theoretical and the witnesses’ description were contradictory and confusing. The author of the drawing, a Government employee, was not called as a witness to explain what he intended to portray by the drawing. The drawing is perhaps an adequate diagram as to the relative arrangement of the three “zones” of fill material,[3] the slope angles, reservoir storage levels, and a few dimensions and miscellaneous instructions paraphrased from the specifications, 'but in other important respects it is misleading, erroneous, self-contradictory, in conflict with another detail drawing contained in Drawing No. 39, and in conflict with Specification 17. A dimension of 220' plus or minus is specified for the distance from the crest of the dam to the original ground surface, but this distance is about 214.2' when calculated by use of the 1" to 100' scale beneath the drawing. Horizontal lines at the bottom of the drawing depict the original ground surface and, below that, the assumed rock surface, which is shown to correspond with the bottom of the cutoff trench,[4] as well as an intermediate un-designated line (whether rock or otherwise is not specifically stated) upon which all of the dam embankment rests except *636 that part above the cutoff trench. No dimensions are provided as to the space between these surface and subsurface lines, but the maximum distance scales at 16' between the original ground surface and the bottom of the cutoff trench, the latter being the lowest foundation point. The edges of the cutoff trench are shown to be about 5' lower than the contiguous foundation line. It cannot be determined from examining the drawing whether the undimensioned spaces separating the surface and subsurface lines are supposed to be actual or theoretical (i.e., diagrammatic) average, minimum, or maximum, or any more than a design representation of the obvious, i.e., that the original ground surface lies somewhere above the assumed rock surface throughout the main damsite. Witnesses for both parties who offered their opinions as to the meaning of the subsurface facts depicted in the drawing demonstrated only their uncertainty and confusion. It is concluded that the “dam-maximum section” drawing is part stylized fiction and part fact, that the specified 220' elevation from ground to crest conflicts with the scaled dimension, that a reasonable 'bidder would not necessarily detect this discrepancy, and that the plaintiff would have been entitled to assume that the subsurface elevations portrayed were maximum estimates.
33. Drawing 39 also contains a detail drawing entitled “profile on center line of cutoff trench-dam”, which has on either side a 1" to 100' scale from which can be roughly computed the respective elevations of the profile lines representing original ground surface, assumed rock surface, bottom of cutoff trench, etc. The scale and details are too small for an accurate.calculation, but the plaintiff calculated that at 13 equidistant points from end to end of the center line of the cutoff trench the distance from the original ground surface to the bottom of the cutoff trench is shown to vary from 3' to 13' across the valley, or an average of 6.3'. The Government computed this average to be 7.5'. Either version of the average, or the plaintiff’s finding of a 13' maximum distance, is substantially less than the 16' difference shown in the “dam-maximum section” drawing described in finding 31, a discrepancy that can only be reconciled either by *637 drafting errors or by the supposition that the 16' difference shown in the latter drawing presumably occurred at some point in the cutoff trench other than the center line shown in the drawing entitled “profile on center line of cutoff trench-dam”. It could also be reconciled by the defendant’s contention that the drawing was merely theoretical and not intended to reflect actual conditions.
34. Article 2 of the contract (finding 30, supra) directs that in the case of difference between the drawings and the specifications the latter will govern. Paragraph 17 of the Specifications provides that the dam “wall have a maximum height of approximately 230 feet above the lowest foundation”. Accordingly, it was reasonable for the plaintiff to conclude in preparing his bid that the maximum amount of excavation he would encounter at the main damsite would be approximately 10', i.e., the difference between the 230' stated by paragraph 17 of the Specifications to be the approximate height of the dam above the lowest foundation (clearly the bottom of the cutoff trench), less the 220' dimension specified in the dam-maximum section drawing to be the distance between the crest of the dam and the original ground surface.[5] The plaintiff would not be charged with knowledge that the latter dimension was in possible error or charged with responsibility to scale the various distances shown in the drawings in order to establish a correct correlation with the Specifications, since the meaning of the drawings in vital respects was ambiguous and indefinite, and these deficiencies would not be immediately apparent to bidders.
35. In addition to the drawings and specifications discussed in findings 31 through 34, the plaintiff and other bidders had available for examination the logs reflecting the analysis of some 25 test cores most of which had been drilled in 1939 in order to ascertain subsurface conditions at the dam-site. Elsewhere in the project outside the main damsite other holes and test pits were drilled. Apparently an unknown number of drill logs were not available for examination. As admitted by Government witnesses, there were not enough *638 cores drilled in sucb a large area as the dam foundation (approximately 22 football fields in size), nor in the proper locations, to provide an adequate estimate of the amount of anticipated excavation, although the Government’s prebid estimates as to excavation quantities (findings 38 and 39) were based primarily on conditions shown by the log reports, as was the Government’s depiction of the “assumed rock surface” lines on relevant contract drawings. Bu Bee did not approve its chief designing engineer’s recommendation in 1952 to drill additional cores, which if done may have permitted more accurate estimates. Estimation of excavation quantities from drill log data is inherently inaccurate. Nor did the logs provide a basis for determining accurately either the depth of excavation before reaching suitable foundation conditions,[6] or for determining the degree of roughness in the underlying rock which plaintiff would encounter in the course of excavating the damsite, particularly in the cutoff trench area of the main dam foundation where most of the difficulty was encountered. Typically the logs reported the various stratification of soils and rocks according to types and depths shown in the contents of each core drill, but from the description given it could not be accurately determined what substances would have to be removed to what depths in reaching suitable foundation conditions, or at what point suitable foundation conditions would be reached, even if the cores had been sufficiently numerous and adjacent to provide a readable and reliable pattern.[7] The cores themselves were available for examination, but they were not complete and those that existed were badly weathered and decomposed in the course of storage conditions over a protracted period, so an examination of them would not have added substantially to the information available from the log reports. Proof of the inadequacies of the log reports as a basis *639 for prediction of subsurface conditions or depths of necessary excavation is evidenced not only by the testimony of Government witnesses but also by the 261 percent variance in the Government’s prebid estimates of quantities of excavation at the damsite. In resisting plaintiff’s allegation that changed conditions were encountered in excavating for the main dam foundation than those shown in the contract documents, the Government places heavy reliance on the drill logs as constituting a clear warning to bidders of subsurface conditions, excavation depths, etc. It is not deemed necessary to analyse in this report the details of the individual drill logs, as defendant has partially done, for the testimony of witnesses for both parties was overwhelmingly to the effect that there were not nearly enough cores drilled to be helpful, and that very little could be interpreted from the logs as a forecast of excavation quantities, ultimate foundation elevations, regularity or roughness of the ultimate foundation, etc. The unreliability of the drill logs to predict depth of excavation is demonstrated in Defendant’s Exhibit 58, which plots each of the drill holes in the main damsite and as to each reports the depth of estimated overburden (taken from a Bu Bee study made in July 1951) and the actual depth of excavation which was experienced. In many instances the estimates were at sharp variance with the experienced depths.
36. Paragraph 55 (b) of the Specifications provided that excavation of the dam foundations shall be—
* * * to a sufficient depth to remove all materials not suitable for the foundation of the dam * * *, as determined by the contracting officer. The unsuitable materials to be removed shall include all topsoil, rubbish, vegetable matter of every kind including roots, and all other perishable or objectionable materials that might interfere with the proper bonding of the embankments with the foundations, or the proper compaction of the materials in the embankments, or that may be otherwise objectionable. All loose, soft, or disintegrated rock shall be removed to the extent directed by the contracting officer from the abutments of the dam * * * embankments. * * * Cut-off trenches, as shown in the drawings, shall be excavated to suitable rock foundations for the dam* * * embankments. * * *.
*640 The suitability of the foundation surfaces depended on the nature of the fill material to be deposited in the particular areas of the dam foundation. For example, in those areas of the. excavated foundation surfaces on which Zone 1 material was to be deposited and compacted, it was necessary to remove all overburden down to clean rock surfaces without sands, gravel, silt, muck, ponds of water, or compressible material, particularly in the cutoff trench area. These standards were somewhat relaxed outside of the cutoff trench area so as to permit small pockets of silt and sands under Zone 1 fill that were not substantially different from Zone 1 material.
37. Neither the specifications nor drawings led bidders to expect to encounter subsurface foundation rock of such extreme irregularity as the plaintiff encountered and as a number of photographs in the record vividly portray, as well as cross-sectional excavation drawings. Drawing 39 may be fairly appraised as representing a relatively smooth “assumed rock surface” in the area of the cutoff trench, and a relatively smooth and regular foundation elsewhere under the main dam. Had Bu Bee expected to run into such a chaotic rockscape it could have depicted the condition in the drawings by conventional symbols or words of warning. However, given the inadequate number of drill holes on which to base such a prediction, and the inherent difficulty in interpreting drill logs in an even more numerous pattern in terms of excavation quantities and potential foundation problems of the type in question, neither Bu Bee nor plaintiff could have reasonably foreseen the actual conditions which clearly qualified as Changed Conditions under Article 4 of the contract.
38. Assuming the validity of the plaintiff’s reliance on a Bu Bee representation drawn from the contract documents that plaintiff would encounter a maximum excavation ait the damsite of approximately 10' to reach suitable foundation conditions (finding 34), the most telling proof of this representation being greatly exceeded in actual excavation experienced at the damsite is contained in a number of cross-section drawings which were maintained by Bu Bee for progress *641 payment purposes and. which reflected in great detail the actual excavation quantities and depths at periodic time intervals, as well as the roughness of the foundation terrain.[8] The plaintiff has relevantly reduced this voluminous data on the cross-section drawings to a convenient table as an appendage to its brief. This table reflects the best evidence of the following conclusions:
(a) The average depth of excavation below ground surface along the center line of the cutoff trench was 15.94'. This average is based on actual measurements taken at sixty-five 20' intervals along the center line, ranging from 5' to 48' in individual excavation depths, and compares to the 6.8' and 7.5' averages estimated by plaintiff and defendant, respectively, based on scaling the dimension in question from the section drawing entitled “profile on center line of cutoff trench — dam” contained in contract Drawing 39 (finding 33).
(b) Upstream and downstream of the center line of the cutoff trench the average maximum depth of excavation in the main dam foundation was 24.71', as compared to the approximately 16' maximum depth shown on the section drawing entitled “Dam — Maximum Section” contained in contract Drawing 39 (finding 32), or the approximately 10' maximum excavation winch, plaintiff construed from the specifications and drawings as described in findings 32-34, supra. The maximum average excavation of 24.71' is based on maximum measurements taken throughout the main dam foundation area at 20' intervals along the center line of the cutoff trench, and at right angles to the said center line. These maximum measurements were not isolated pockets which were excavated to extreme depths, but were sizeable areas which averaged 435.56' in width and spread over sixty-nine 20' intervals perpendicular to the dam axis, and were quite representative of the entire main dam foundation area.
*642 (c) The table also shows that roughness and irregularity in the foundation surface was characteristic, since it occurred in large patches averaging 315.8' in width upstream and downstream from the dam axis, according to measurements made at sixty-nine 20' intervals along the dam axis and perpendicular thereto. The roughness and irregularity of the foundation surface reflected by these statistics is necessarily a subjective interpretation based upon the surface irregularities shown in the voluminous cross-section excavation drawings. A study of these drawings does not necessarily yield exact verification of the plaintiff’s statistical interpretation of the average width of the rough patches, but the drawings do indicate that a condition of extreme irregularity in foundation surfaces occurred over a substantial portion of the main dam foundation area, some individual patches being more pronounced in that respect than others.
39. In preparing the 'bid invitations Bu Bee estimated a total excavation of 132,955 cu. yd. of overburden under the main damsite to reach suitable foundation conditions. This estimate was based on the removal of an average of 2' of overburden above elevation 4,450' (which presumably would be on the left and right abutments) and 5' below that elevation (which would presumably be the bottom of the dam generally), plus an average of 3' more for the cutoff trench area to get down to bedrock there as specifications required. This estimate contrasts with the representation in the drawings and specifications of a 10' maximum excavation below ground surface, at the lowest part of the foundation, as described in finding 34, supra-, or the approximately 16' depth of the bottom of the cutoff trench shown in the dam— maximum section drawing which is part of contract Drawing 39. Plaintiff actually excavated a total of 347,246 cu. yd. for the main dam foundation, an increase of 214,291 cu. yd. or 261 percent over Bu Bee’s precontract estimate of 132,955 cu. yd. Item 2 of the Schedule provided an estimate of 420,000 cu. yd. of overburden excavation in open cut which was for excavation at several locations in the project, including the main dam foundation. At the time of his bid, plaintiff did not know that Bu Bee had allocated 132,955 cu. yd. of *643 excavation out of the total 420,000 cu. yd. to the main dam foundation, but from the contract drawings it was possible to make a rough allocation of the 420,000 cu. yd. to the various locations, including the main dam foundation. The overrun in material to refill the dam embankment which required extraction from borrow sources, transportation to and placement in the dam embankment, was 327,617 cu. yd. General Condition 4 of the contract advised that the quantities estimated in the Schedule were “approximations for comparing bids, and no claim shall be made against the Government for excess or deficiency therein, actual or relative. * *
40. (a) Certain conclusions may be reached as to the total overruns in excavation and fill in the entire project, including that for the main damsite,[9] expressed in terms of quantities as well as contract values.
(b) Thus, contract Schedule Items 2, 3,4, 5 and 6,[10] which comprised generally open-cut excavation wherever it occurred for the dam and dikes, plus excavation for the tunnel, gate chamber, and access shaft, were estimated by Bu Bee prior to the contract invitations in the collective quantity of 753,840 cu. yd., but performed in the net quantity of 1,002,-315.2 cu. yd., for a collective overrun of 248,475.2 cu. yd. (including in the computation an underrun of 19,515 cu. yd. for Schedule Item 3), or an increase of 24.8 percent.
(c) Contract Schedule Items 9,10,11,12,13,14,15,16,17, 18, 19, 20, 21, 22, 23, 24 and 25, which comprised generally the stripping and excavation of borrow areas and rock sources and transportation of the material to the dam and dike embankments, backfill, and deposit of rock and other fill on the several embankments, were estimated by Bu Bee prior to the contract invitations in the total quantity of 8,376,000 cu. yd., but performed in the net quantity of 8,696,421 cu. yd., for a net overrun of 320,421 cu. yd. (including in the computation underruns totaling 279,444 cu. *644 yd. for Items 12,13,14,18,19, 24 and 25), or an increase of 3.7 percent.
(d) Expressing these net overruns in quantitative terms may not be a fair reflection in terms of the relative work involved for the contractor, since by way of illustration excavation of overburden (Item 2) was compensable by the contract at 35 cents per cu. yd., while rock excavation (Item 4) was compensable at $22 per cu. yd., so that 10 yards of rock excavation could not be compared to the same quantity of overburden excavation. Extrapolated to reflect the contract value of the additional excavation and fill throughout the project, the net overruns bore a contract price of $422,207.85 (i.e., $528,132.09 in overruns less $105,924.24 in underruns), which is 10 percent of the original contract price of $4,246,380.
These statistics, however, must be read with discrimination. By totaling net overruns throughout the project they fail to reflect the concentration of overruns in the main dam area itself as described in finding’ 38, which is the only area claimed by plaintiff to be responsible for his difficulties. Furthermore, the statistics of excavation quantities fail to reflect the severity of the conditions under which the excavation was performed, as referred to in findings 29, 35, 37, 38(d), and elsewhere in this report.
40. Although the cutoff trench below the main damsite was designed to have a maximum width of 150' and a particular configuration both horizontally and vertically, in actual fact the designed shape for the cutoff trench was followed only roughly. Its outlines became amorphous as it became progressively more necessary to excavate the contiguous foundation areas down to rock in order to reach suitable foundation conditions as determined by the contracting officer. Thus, the horizontal outlines of the cutoff trench became indistinguishable from the highly irregular surrounding foundation surfaces, in certain places extending from 300' to 500' in width in comparison to the maximum designed width of 150'. Due to the extreme irregularity of the rock surface which characterized much of the excavated dam foundation the cavity design disappeared or became indistinct.
*645 41. By February 1,1954, plaintiff bad excavated in excess of 119,660 cu. yd. of Item 2 material (excavation overburden in open cut) from tbe main dam foundation, and by March 2, 1954, bad exceeded tbe Government’s prebid estimate of 420,-000 cu. yd. of Item 2 excavated material from all areas of tbe project. Plaintiff was then ahead of its construction progress plan for excavation.
42. Of tbe overrun of 214,291 cu. yd. of excavation from tbe main dam foundation, tbe Government classified 208,-597 cu. yd. (or 97.4 percent) as Item 2 material, tbe contract price for which was 53 cents per cu. yd., and 5,693 cu. yd. (or 2.6 percent) as Item 3 material at a contract price of $1.20 per cu. yd. Prior to bid tbe Government bad estimated that 10 percent of the total excavation for tbe main dam foundation would constitute Item 3 material.
43. Paragraph 52 of the Specifications provides m pertinent part as follows:
52. Glassification of excavation. Except as otherwise provided in these specifications, for stripping and common excavation in borrow areas, excavated materials will be classified for payment only as follows:
(a) Excavation, all classes, includes:
(1) Bock excavation. — Bock excavation includes all solid rock in place which cannot be removed until loosened by blasting, barring, or wedging, and all boulders or detached pieces of solid rock more than 1 cubic yard in volume. Solid rock under this class, as distinguished from soft or disintegrated rock under common excavation, which also requires blasting before removal, is defined as sound rock of such hardness and texture that it cannot be loosened or broken down by hand-drifting picks. No material, except boulders or detached pieces of solid rock, will be classified as rock excavation, which is not actually loosened by blasting before removal, unless blasting is prohibited and barring, wedging, or similar methods are prescribed by written order of the contracting officer.
(2) Common _ excavation. — Common excavation includes all material other than rock excavation and overburden excavation; including, but not restricted to, earth, gravel and also such hard and compact material as hardpan, cemented gravel, and soft or disintegrated rock, which cannot be removed efficiently by excavating *646 machinery until loosened by blasting, also all boulders or detached pieces or solid rock not exceeding 1 cubic yard in volume.
(b) Excavation overburden. — Excavation, overburden, in opencut will include all common excavation which can be performed without blasting regardless of depth.
* * * It is desired that the contractor or the contractor’s representative be present during measurement of materials excavated. On written request of the contractor, made within 20 days after the receipt of any monthly estimate, a statement of the quantities and classifications of excavation between successive stations or in otherwise designated locations included in. said estimate will be furnished to the contractor within 10 days after the receipt of such request. The statement will be considered as satisfactory to the contractor unless specific objections thereto, with reasons therefor, are filed with the contracting officer, in writing, within 20 days after receipt of said statement by the contractor or the contractor’s representative on the work. Failure to file such written objections with reasons therefor within said 20 days shall be considered a waiver of all claims based on alleged erroneous estimates of quantities or incorrect classification of materials for the work covered by such statement.
44. Paragraph 55(b) of the Specifications, entitled “Excavation in open-cut", provides in pertinent part as follows:
(b) Excavation for foundations of dam and dike embankments. — The entire areas to be occupied by the dam and dike embankments or such portions thereof as may be directed by the contracting officer, shall be excavated to a sufficient depth to remove all materials not suitable for the foundation of the dam and dike embankments, as determined by the contracting officer. The unsuitable materials to be removed shall include all topsoil, rubbish, vegetable matter of every kind including roots, and all other perishable or objectionable materials that might interfere with the proper bonding of the embankments with the foundations, or the proper compaction of the materials in the embankments, or that may be otherwise objectionable. All loose, soft, or disintegrated rock shall be removed to the extent directed by the contracting officer from the abutments of the dam and dike embankments. Slopes of the abutments shall be *647 reduced to provide satisfactory foundation, contours, as shown on the drawings or as directed. Cut-off trenches, as shown on the drawings, shall be excavated to suitable rock foundations for the dam and dike embankments.* * *
45. In January 1953 Bu Rec officials conferred with each other on the question of classification of excavated materials. There was considerable difference of opinion as to the interpretation to be given the language of the specifications classifying excavated materials for payment purposes. The conferees decided that the criterion for classification of excavated materials between “Excavation — All Classes” and “Excavation — overburden” was as to whether blasting or its equivalent (i.e., barring and wedging) was necessary, a view sponsored by Mr. Goehring. By then the plaintiff had made verbal protests as to classification of some excavated material, but no written protest.
46. The plaintiff’s first written protest of record regarding the Government’s classification of excavation for pay purposes was dated February 27, 1954, and read in pertinent part as follows:
We are, at this time, protesting the method of classification with reference to contract item No. 3, Excavation, All Classes, in open cut.
Contract paragraph No. 52, Classification of Excavation, provides that excavated materials will be classified for payment only as follows:
(a) Excavation All Classes includes:
(11 Rock Excavation
(2) Common Excavation
(b) Excavation, Overburden.
Our interpretation of the contract classification of Excavation, All Classes includes the excavation of both rock and common materials, and the item of Excavation, Overburden includes only all overburden, which item of overburden, we interpret to include unsuitable materials such as top soil, float rock, rubbish, roots and other perishable materials.
*****
The specifications provide that Excavation, All Classes, includes both rock excavation and common excavation and therefore the use of explosives is not necessary to *648 place the material into the All Classes classification. The item of Excavation, Overburden we interpret to be a surface-stripping excavation only and after the overburden has been excavated the material falls into the All Classes classification of excavation.
47. The plaintiff’s protest of February 27, 1954, referred to in finding 45, remained unanswered for a protracted period. In the meantime there is no evidence that plaintiff made any formal compliance with the requirements of the concluding paragraph of paragraph 52 of the Specifications (finding 43, supra) as to challenging the monthly estimates of quantities and classifications of excavation. On October 22, 1954, the plaintiff’s protest of February 27, 1954 was forwarded to Bu Sec by the Government’s construction engineer, Mr. Goehring, with a request for a formal opinion as to proper criteria for excavation classification if the criteria agreed upon by the Bu Sec conferees in January 1953 (see finding 45, supra) was not to govern. Mr. Goehring’s letter of October 22,1954, to Bu Sec, enclosed a proposed letter of reply to Adler which Goehring had prepared but had not sent to plaintiff pending approval by superiors at Bu Bee. By this time Goehring had discussed the excavation problem with Adler a number of times, and in the meantime by October 1, 1954, the overrun of excavation at the main damsite had reached approximately 184,000 cu. yd. (303,140 cu. yd. total excavation at main damsite less Government prebid estimate of 119,660 cu. yd.). By then also Adler had commenced to refill the excavated areas of the main damsite to form the dam embankment, so the physical features of certain areas of the foundation area were covered over and obscured from view, assuming their visibility would have aided in the excavation classification problem, or in the determination of foundation conditions encountered.
48. Having received no reply from his Bu Bee superiors to ibis communication of October 22, 1954, as referred to in the preceding finding 47, on April 26, 1956, Mr. Goehring wrote ’again to his Bu Bee superiors enclosing Adler’s protest letter of February 27,1954, and a proposed reply to it which Mr. Goehring had drafted but withheld pending authoriza *649 tion of bis superiors to forward it to Adler. Mr. Goehring’s letter of April 26,1956 to bis Bu Bee superiors reviewed tbe excavation classification problem, reported some intra-Bu-reau conflicts concerning proper interpretation of tbe earthwork specifications as to excavation classification, adhered to bis earlier view that tbe proper criterion to distinguish between “all classes” excavation and “overburden” excavation was tbe necessity for blasting which characterized the former, discussed particular conditions where all-classes material must be blasted to get access to pockets of common excavation requiring removal, and enclosed sketches illustrating typical geological formations presenting this problem. The letter enclosed a proposed reply to Adler’s original inquiry of February 27, 1954, which expressed “regret that reply has been delayed”. It also stated that Adler 'had made no formal written protest to date but one was expected, and requested a Bu Bee opinion. By April 26,1956, the project was nearing completion.
49. In classifying the excavated materials for pay purposes under the specifications, the Government classified and paid for as overburden “The sand, mud and gravels, including loose detached rock of various sizes less than one cubic yard * * *”. Plaintiff considers that such materials should have been classified and paid for as “Excavation — all classes”. Plaintiff also contends that all of the 214,291 cu. yd. of overrun in excavation in the main dam foundation should have been classified and paid for as “excavation — all classes”.
50. Plaintiff had an orderly plan for the progressive completion of the project, including sequentially: clearing of the construction and borrow areas, excavation of the diversion and outlet tunnels and of the two dike foundations, installation of grout cap concrete in the dikes, excavation of the vertical shaft for the tunnel, construction of a cofferdam at the downstream toe of the main dam by using some of the burden removed from the main dam area, diversion of the stream after completion of the tunnel and stilling basin, removal of all overburden from the bottom and abutments of the main damsite, excavation for and placement of grout cap concrete in main damsite, and drilling and grouting of the *650 subfoundation area for the main dam. As soon as tibe foundation. of the main dam had 'been completely excavated, including the cutoff trench, and the grout cap and grouting completed, it was then planned to commence the placement of fill for the main dam by placing limited 'amounts of Zone 2 (fine rock fill) and Zone 3 (large rock fill) materials at the downstream toe and spreading Zone 1 fill material (earth) over the rest of the bottom. The three types of fill for the main dam were to 'be placed over the entire damsite in successive layers from abutment to abutment and toe bo toe so as to provide operating room for the efficient use of the earthmov-ing and placement equipment. Thereafter, the remaining concrete structures and roadways would be completed, temporary haul roads would be removed, the area generally beautified 'and landscaped, and the residuals of the contractor’s presence removed. The plaintiff’s progress chart projected removal of all the scheduled 420,000 cu. yd. of overburden by March 31, 1954, and completion of the entire project in 950 days ending June 25,1955.
51. Plaintiff adhered roughly to its schedule until about February 1954. At the outset and subsequently as needed it moved in an adequate supply of equipment in good condition. Equipment and labor forces were deployed at the outset as scheduled. The dikes were started in early 1953 and substantially completed by the end of the 1953 construction season without encountering any untoward subsurface conditions departing from those anticipated. The stripping excavation operation (i.e., overburden removal) for the main dam foundation was started in mid-1953 in the area of the abutments on either side of the dam and the lower reaches of the bottom area adjacent to both sides of the creek. By December 20, 1953, the cofferdam was completed with materials removed from the dam foundation, the outlet works and diversion tunnel were completed, and the creek diverted. Thereafter, the river section of the dam area was stripped and excavated and the materials thus obtained were used to complete the cofferdam. By the end of February 1954 plaintiff had excavated virtually all of the scheduled quantity of Item 2 overburden from the main dam foundation, but had not reached *651 foundation, surfaces suitable to the Government. By March 2, 1954, it had excavated ¡the full amount of the Item 2 materials (420,000 eu. yd.) estimated by the Government for the entire project, and was accordingly slightly ahead of its own schedule at that time. By this time the plaintiff encountered the difficult subsurface conditions described elsewhere in this report (findings 37, 38(c), supra), as the Government representatives directed that excavation be continued until suitable foundation conditions were reached.
52. As a result of the subsurface conditions encountered in the excavation of the main dam foundation the plaintiff’s plans for utilizing his equipment and labor forces were badly disrupted and thrown off schedule. He was forced to perform the foundation excavation and refill in piecemeal manner in small areas at a time instead of the large sections he had contemplated, thus frustrating the efficient use of his equipment and operating personnel. In stripping off unsuitable materials and excavating overburden he encountered numerous projections of solid, irregular rock, which deprived his construction equipment of room to maneuver efficiently in the confined areas dictated by the obstructions. In such areas his large tractors and high-speed, rubber-tired scrapers could not be used to full advantage because of the abrupt drops and protrusions. Excavation and refill proceeded on a random, disorganized basis. Much of the excavation had to be performed with small backhoes and by hand instead of equipment designed for more efficient performance. Quantities of excavated material had to be loaded onto small trucks for removal, and the arrival and departure traffic pattern for these vehicles was forced by the terrain to be circuitous. Instead of being able to place fill in quantity sequence over large areas, it had to be accomplished in small segments as they became available. Material required abnormal rehandling. Ramps had to be constructed to enable vehicles to negotiate precipitate changes in elevations. In some areas from 15' to 20' of overburden had to be removed before hitting the tops of rock formations and dropping into pockets to additional depths of 10' to 15', some of which could not be reached by a % yard backhoe. The conditions as described prevailed over *652 extensive areas of the main dam foundation, and are graphically depicted in a number of photographs accompanying the record which were taken at progressive stages of performance. The depths of excavation are also reflected in the cross-section excavation drawings discussed in finding 38, sufra. Since approximately 83 percent of all excavation and refill work to be performed in the entire project concerned the main dam itself, any substantial overrun of excavation in the main dam foundation area was critical to the construction progress of the entire project.
53. (a) On December 2, 1954, Bu Rec wrote its construction engineer at the worksite expressing concern that the plaintiff’s revised construction program, because of the heavy overruns in excavation at the main damsite with which Bu Eec was familiar because of its increasingly accurate method of reporting excavation quantities, was four or five months behind the original completion schedule, and recommended that plaintiff be “urged to complete the work at the earliest possible date in order to minimize the assessment of liquidated damages”. On May 4,1955, a Government inspector visiting the worksite advised Bu Eec that “arrangements for speeding up his [plaintiff’s] operation should be completed and in operation at present”. After summarizing the work status and the overrun situation, the inspector concluded that “Unless the contractor is able to better organize his work and speed up his operation it will be impossible to complete construction this year”. On June 15, 1955, the construction engineer at the worksite advised Bu Eec that “We are continuing our advice that he [plaintiff] should accelerate production to complete the fill this calendar year”. He anticipated the work would go into the winter months.
(b) On June 22,1955, the construction engineer at Pactóla, in acknowledging plaintiff’s revised construction program which he said was not satisfactory, pointed out that it would be impossible to install any volume of Zone 2 rock fill and rock fines fill on the main dam embankment during the ensuing winter months of freezing weather because of the specification requirement for wetting the material, and continued:
In order that the Bureau of Eeclamation may meet its commitments, which are essential to completion of *653 relocated Highway 85A, reroute of traffic, and start of water storage, it is necessary that the embankment be completed by the end of this calendar year, at the latest. Please review your construction program and equipment needs with a view to increasing production on all lagging features and particularly those rock items which you now indicate will not be completed until March 1956.
(c) On October 14,1955, the construction engineer at Pac-tóla described to Bu Bee the plaintiff’s arrangements to procure additional equipment and items of additional work remaining to be done during the forthcoming cold weather. The letter stated:
As you know, for many months we have been urging the contractor to acquire more equipment to expedite completion of Ms work. I feel that we have exerted every possible influence in that direction. From time to time w® have been advised by him of proposed purchases, rental deals, and impending subcontracts, all of which failed to materialize.
54. During the progress of the work plaintiff called attention of Bu Bee representatives to changed subsurface conditions which it contended differed from those anticipated by the specifications and contract. On June 15, 1955, plaintiff wrote to Bu Bee requesting a 419-days’ time extension, consisting of 234 days for overruns in overburden excavation at the main dam foundation, and 185 days for a correlative overrun in excavation at Bock Source B needed to fill the main dam embankment. The request for a 419-days’ time extension was reduced by plaintiff to 329 days by certain offsets which are not relevant to the immediate controversy. The letter left open the possibility of further time extensions being required before tbe job was completed, and stated as follows:
Our present time for completion of tbe contract bas been set as July 29,1955; therefore it is of the utmost importance and urgency that the time for completing the contract be extended as quickly as possible. We cannot suffer the penalty of liquidated damages on Pactóla Dam Contract, especially when such extensions of time are due to causes beyond our control.
Plaintiff made no request in tbe letter for an increase in monetary compensation.
*654 55. Under date of July 13, 1955, the contracting officer issued bis findings of fact on plaintiff’s claim of June 15, 1955, in wbicb findings of fact he extended the plaintiff’s time for performance by 159 days (as compared to plaintiff’s request for 329 days) due to overruns in excavation and refill. The 159 days’ extension consisted of 42 days for overran in Item 2, excavation, overburden, in open cut (646,000 cu. yd., instead of scheduled 420,000 cu. yd.); 110 days for overrun in excavation for fill placed in the dam foundation (including a concurrent 12 days for Change Order No. 3 involving substitution of gravel for rock fines fill); and 7 days for Extra Work Order No. 1 involving a matter not directly relevant to the present controversy. Paragraph 6 of the findings of fact attributed the bulk of the delay “to the overrun in excavation of overburden in preparing the dam foundation, and due to overrun of the volume of material contained in the lower portion of the dam”. Government miscalculation of excavation and fill quantities was implicit in the finding of substantial overruns. The time extension was granted by the contracting officer under Article 9 of the contract entitled “Delays-Damages”, on the basis of his finding that the overruns were an unforeseeable cause of delay beyond the control and without the fault or negligence of the contractor, and therefore contractually excusable. No findings were made as to changed conditions which had been alleged by plaintiff in its protest of June 15,1955.
56. On August 17, 1955, plaintiff filed a Notice of Appeal with the Department of the Interior Board of Contract Appeals, and on August 31, 1955, supplemented the notice with a letter which described the details of plaintiff’s objections to the findings of the contracting officer. On November 17, 1955, the contracting officer withdrew his findings of fact issued July 13, 1955, pending further investigation to determine the full extent of the delays. In a letter to Adler dated November 22, 1955, the contracting officer stated as follows:
Because the overrun of quantities cannot be definitely determined until near the end of the job, the supplemental findings will probably not be made until work under the contract is substantially complete. Our release of *655 liquidated damages until the job is complete should not be taken as an indication that the supplemental findings of fact will excuse all of your delay. On the basis of information presently available it appears unlikely that all of your delay will be found to be excusable. Accordingly, you are urged to plan your operations for the winter and for next construction season to complete the work at the earliest possible date and thereby minimize the amount of liquidated damages to be deducted from your final voucher. In the event the supplemental findings do not excuse the entire delay, you can then appeal those foldings and secure an administrative review of the entire matter.
57. Although the plaintiff had provided ample equipment for performance of the contract according to its original dimensions, as the substantial overruns in excavation and the difficult foundation conditions materialized it became apparent that additional equipment would be required to cope with the situation and to meet the Government’s insistent demands for performance acceleration. Eesponding, the plaintiff in 1954 brought in a 2/2 cubic yard Lima power shovel, six new Euclid quarry trucks, another Sheepfoot roller, and another large air compressor. In October 1955 plaintiff added five or six units of high-speed, rubber-tired, earthmoving scrapers and a D-8 dozer push cat brought from Wyoming and other South Dakota locations for digging and hauling, and four units of earthmoving belly-dump wagons imported from a Tiber dam job about 400 miles away from Pactóla. The rough topography and pocketed work areas in the main dam foundation site prevented efficient utilization of equipment and required more equipment to accomplish less work than under more normal conditions, as explained in previous findings.
58. Paragraph 9 of the contracting officer’s supplemental findings of fact issued July 11,1956, reads in part as follows:
9. * * * However, the work was seriously curtailed early in November 1955 by severe cold weather and snow. Ordinarily the contractor would have -been able to work until the middle of December with very little lost time due to weather. In spite of the severe weather of the 1955-1956 winter, the contractor kept the work going throughout the winter, although at a reduced rate, until *656 warmer weather in April permitted the resumption of full-scale work on the excavation, all classes, items. Because the overruns forced the work to be performed over a longer period, extending over a severe winter season not anticipated when the contract was entered into, the contractor is entitled to an extension of time for any delay occasioned by the winter weather. Excavation, all classes, during the winter was only about 55 percent of the production during warmer weather. Accordingly, it is found that for the 5-month period from November 1955 to March 1956, inclusive, the contractor was delayed 45 percent of the time by a winter season not contemplated by the contract. * * *.
59. The winter of 1955-56, from November through March, was unusually severe, particularly the months of November and December which brought record low temperatures. The following excerpts from the Climatological Data published by the United States Weather Bureau for South Dakota indicate the conditions:
NOVEMBER 1955
This was the coldest November since 1896 with the temperature averaging 23.3°, 9.8° below normal. November 1896 was substantially colder with temperatures averaging 17.4°. This year, winter conditions -began early with moderate snow in the middle and near the end of the month. In the open country, snow covered the ground for a week or so and then thawed partially during a mild period. * * *.
❖ ❖ . ❖ ❖ sj:
* * * The general freeze-up of streams in the State occurred two to four weeks earlier than usual. * * *.
* * * On the 16th, Rapid City had —14°, which was the lowest ever recorded so early in the season and also the lowest ever recorded there during the month of November. * * *.
DECEMBER 1955
The severe cold spell that began in November intensified during the first part of December, then came to an end shortly before Christmas. It was the 8th coldest December on record. Only three other Decembers have had a heavier snowfall. * * *.
*657 Low temperature readings such, as those experienced this month are not unusual, except ordinarily they occur later in the winter and are usually not so prolonged. The preceding month had seen only brief intervals of above-normal temperatures, and during the first three weeks of December there was no relief at all from the extreme cold. * * *. Below-zero readings were common and out-of-doors work was hampered considerably. * * *. The average temperature for the month was 13.8°, 8.2° below normal.
$ $ $ * ‡
* * *. Heating requirements, as estimated from degree-day computations, were 110 to 125% of normal for both the month and for the season to date. * * *.
JANUARY 1966
Dry and mild weather prevailed the first part of January followed by a return to wintery conditions the last half of the month. Across nearly all of the state temperatures averaged below normal for the third consecutive month. * * *.
* * *. Temperatures were below normal over all except the southwestern part of the state [where Pactóla Dam is]. * * *.
FEBRUARY 1956
Temperatures were cold, but this February was not so severe as many previous ones since there were no major storms. * * *.
Temperatures were below the long-term means at all stations except Orman Dam, Ludlow 2 NW, and Rapid City * * * the warmest localities were found around the lower elevations of the Black Hills and in the Southwest. Highest temperature was 65° at Rapid City on the 23rd, * * *.
‡ iff % ❖ *
* * *. The heaviest snow of the month fell on the 15-16th, accompanied by near-blizzard conditions in the west and central on the 16th. Travel east of Rapid City was halted temporarily. * * *.
MARCH 1956
Wintry conditions continued during much of March; however, near the end of the month there was some relief from the cold temperatures that had persisted since November. * * *.
*658 Until May 1955 the weather readings closest to Pactóla Dam were made at Rapid City, which is 1,283' lower in altitude than Pactóla (4,525'), and has temperatures from 3° to 7° lower than Pactóla.
60. Pactóla Dam is located in what is sometimes known colloquially as the “banana belt” of South Dakota, which has reference to its usually more moderate climate than the rest of the state. Plaintiff had scheduled its work under the original contract to be carried on as much as possible through the winter months, but did not contemplate working through the 1955-56 winter since the original completion date was June 1955. At the urging of the Government plaintiff worked under weather conditions in the 1955-56 winter which would ordinarily have caused him to suspend or reduce activities, particularly in November and December 1955. The work he accomplished during this period comprised mainly the drilling and blasting of rock in Nock Source B, loading the material thus blasted by power shovel into trucks and hauling them to the main dam embankment, dumping them there in the respective zones. Working under these conditions decreased the efficiency of plaintiff’s equipment and manpower by causing frequent and serious breakage of equipment components, shovels, caterpillar bulldozers, caterpillar rock rakes, and quarry trucks; interfered with regular flow of work; caused equipment starting difficulties; disrupted normal rock drilling, blasting and excavating, transportation and placement procedures. The severity of the 1955-56 winter accentuated the difficulties of contract performance which are common to normal whiter weather, as in the preceding winters of Adler’s performance at Pactóla.
61. In April 1956 the Government and the bonding company knew that Adler was in serious financial straits and was having difficulty in meeting bills from suppliers and subcontractors. By June 1956 he owed $93,670 to Texaco, and $40,000 to the grouting drilling subcontractor, and was being pressed by the holders of substantial Miller Act claims. Plaintiff’s financial straits resulted from a combination of factors, including the Government’s decision not to correct the $136,000 error in plaintiff’s bid (findings 5 through 25, *659 supra), the changed subsurface conditions and consequent overruns of excavation and fill,[11] acceleration of contract performance through the 1955-56 winter, the disparity in plaintiffs corrected bid compared to competing bids, alleged misclassification of excavation, retained percentages of progress payments, and the Government’s failure to pay him for certain Orders for Changes which plaintiff had performed sometime previously and the payment for which was subject to negotiation. Plaintiff had no precise knowledge as to whether he would eventually be charged liquidated damages for some part of his delays at the rate of $22,500 per month for, while his time for performance had been extended to January 4, 1956 (from July 29, 1955) by the contracting officer’s findings of July 13, 1955 (see finding 55, supra), these findings were withdrawn on November 11, 1955, with the understanding that new findings would be prepared later when the full extent of the overruns and delays was more ascertainable, and that in the interim no liquidated damages would be assessed. The construction engineer advised Bu Eec in May 1956 that plaintiff intended to “make very substantial claims for extra costs on the admitted rather high overruns on certain specification items”. A meeting was in prospect over these claims. In the meantime plaintiff could not know whether some liquidated damages would be eventually assessed for his delays. This uncertainty was not conclusively relieved until July 11, 1956, when the findings of fact issued by the contracting officer granted a time extension of 159 days to August 15, 1956, as compared to the 329 days plaintiff had requested June 15, 1955. Adler could reasonably have expected to receive a time extension commensurate with the overrun in excavation, but he did not know what this period would be as eventually determined by the contracting officer.
*660 62. At the outset of a conference held between the parties on July 5 and 6, 1956, to determine the extent of the time extension to be granted and to agree upon extra costs of performance, the Bu Eec representatives proposed to extend the time for performance to April 27, 1956, which would have left plaintiff liable for liquidated damages beyond that date. By the end of the conference Bu Eec had agreed to extend the time to August 15,1956, which was satisfactory to plaintiff, in that substantial completion by then was anticipated. At the conference the parties discussed plaintiff’s claim that overruns on scheduled quantities of overburden and excavation, all classes, had resulted in additional costs, 'but after considerable discussion the Bu Eec representatives concluded that no changes had been made which would account for these overruns. The conferees also agreed upon issuing Order for Changes No. 5 to compensate plaintiff for 11 specified items of changed work in the total sum of $43,314.39, as described in finding 63, infra. At the conclusion of the conference the plaintiff signed the following letter to Bu Eec dated July 6, 1956, prepared by the latter:
Eeference is made to conference held with representatives of the Bureau of Eeclamation on July 5 and 6, 1956, regarding our claims for extra work and changes in connection with Contract No. 14-06-D-254 for construction of Pactóla Dam under Specifications No. DC-3783, Missouri Eiver Basin Project.
This will confirm understanding reached in conference that the payment by the Bureau of Eeclamation of the sum of $43,314.39 to us for extras and changes as discussed at the conference will be accepted as settlement in full of all claims for additional compensation under the contract arising out of work performed to date.
Upon the Bureau’s execution of a formal contract document providing for the above payment, all claims for additional compensation presently pending will then be considered as withdrawn without further action by the contractor, and no new claims for additional compensation will be made on the basis of anything occurring prior to July 6,1956.
No reservations were specified in the foregoing release. The release was signed by plaintiff several days before the grant *661 ing of a time extension by the contracting officer’s findings of fact of July 11, 1956, and the receipt on July 18,1956, of Order for Changes No. 5 paying plaintiff the sum specified in the release. Adler testified that he was required by Bu Bee to sign the release if he wanted to be paid the sum provided for in Order for Changes No. 5 which was promptly issued thereafter, but this is denied by Government witnesses. The release by Adler of all excavation and fill claims up to July 6,1956, by payment of $11,618.04 for 5,322 cu. yd. in a relatively small area of the river section of the main dam foundation and $330.77 for excavation in the cutoff trench is inconsistent with the known existence of much more extensive claims for changed conditions and overruns as reflected in the exceptions reserved by Adler in connection with subsequent releases which he signed (see findings 67 & 78, infra). At this time Adler did not have access to full Government data as to excavation and fill quantities because Bu Bee was packing up its records as the completion of the project neared.
63. The figure of $43,314.39 referred to in the release letter of July 6, 1956, quoted in finding 62, is the increased cost allowed plaintiff by Order for Changes No. 5 which was dated June 14,1956, but not received by plaintiff until July 18, 1956. Whether the conference between the parties on July 5 and 6, 1956, which ended with plaintiff signing the release letter, effected any changes in the original contents of the June 14, 1956 Order for Changes No. 5 cannot be determined. From the date sequence it would appear that at the July 5 and 6 conference the plaintiff merely approved of or accepted the determinations that had already been made by Bu Bee and incorporated in the June 14 Change Order. Another possible explanation is that the Order for Changes was prepared at the July 5-6 conference but backdated to June 14 for unexplained reasons. Order for Changes No. 5 provides compensation totaling $43,314.39 for 11 listed changes, of which the first one accounting for $41,618.04 of the total, read as follows:
In lieu of excavating all classes excavation to provide a reasonably uniform foundation surface in the river *662 bottom area of the dam, you are directed to excavate overburden from crevices, cavities, and channels and refill such excavation to 1 foot above rock pinnacles with specially compacted Zone 1 material.
This work, which had been actually completed by plaintiff by September 20, 1954, involved 5,322 cu. yd. of additional excavation and fill, at the rate of $7.82 per cu. yd. Of the remaining ten items listed and paid for by Order for Changes No. 5, the second one paid $330.77 for 3,007 cu. yd. additional excavation in the cutoff trench at $0.11 per cu. yd., and this had been completed in July 1953. The remaining nine items in Order for Changes No. 5 totaled only $1,365.58 (including a deduction item of $103), and involved items of work not related to the main dam foundation. Under date of July 30, 1956, Adler executed a statement at the end of the Order for Changes No. 5 certifying that “Adjustment of the amount of compensation due under the contract and/or in the time required for its performance by reason of the changes ordered above is satisfactory and is hereby accepted.” The Order for Changes No. 5 made no reference to time extensions for the extra work. All but two of the 11 items covered by Order for Changes No. 5 had been completed by late 1954.
64. On July 11, 1956, the contracting officer issued supplemental findings of fact which granted plaintiff a time extension of 332 days to August 15, 1956, and described the basis of the allowance in detail. These findings were a final response by the contracting officer to the plaintiff’s letter of June 15, 1955, requesting a time extension, and were a substitute for and enlargement of the contracting officer’s findings of July 13, 1955 (finding 64, supra), which had been withdrawn November 17, 1955 in an order which suspended the assessment of liquidated damages until the facts could be more accurately determined. The latest findings of fact increased the time extensions previously granted by means of dividing the total amounts of overrun and fill by figures considered to represent typical daily production by the contractor based on his performance over a long period. Addi *663 tional time extensions were based on other factors, including 68 days for delays caused by the severe 1955-56 winter in which the contracting officer estimated that the contractor could work at only 55 percent efficiency. No mention was made in the July 11, 1956 findings of fact of delay-damage claims by plaintiff, or of the claims referred to in Order for Changes No. 5 (finding 63, supra). The concluding paragraph of the July 11,1956 findings of fact advised the plaintiff of his appeal rights under the contract. Since the time extension granted eliminated the prospect of liquidated damages, disagreement by plaintiff as to the method of computation became moot.
65. On August 15, 1956, the project was accepted by Bu Rec as being substantially complete, although there was a substantial amount of cleanup and beautification to be completed, roads to be eliminated, and debris buried. It was fully completed by January 8,1957, and was considered to be very well constructed, attractive, and watertight.
66. After the substantial completion of the project on August 15,1956, plaintiff performed certain additional work ordered by Order for Changes No. 6 dated July 20, 1956. This work related to raising a road grade, surfacing a parking area, and excavating a ditch on the side of a road through Rock Source B, for which on November 19,1956, he accepted the sum of $5,463.30, as agreed to at a conference between the parties on November 7,1956.
67. (a) On November 20, 1956, Adler executed a release form which provided in part as follows:
Now, Therefore, in consideration of the premises and the payment by the United States to the contractor of the amount due under the contract, to wit, the sum of Two hundred thirteen thousand, five hundred sixty-two and 60/100 dollars ($213,562.60), the contractor hereby re-mises, releases, and forever discharges the United States of and from all manner of debts, dues, sum or sums of money, accounts, claims, and demands whatsoever, in law or in equity, under or by virtue of the said contract, except contract items and quantities as listed on the reverse side hereof.
*664 The reverse side of the release summarized the following exceptions totaling $198,633.20:

Item No. Nature of Work Excepted Unit Quantity Price Total

Excavation, all classes, in open cut . 19,027 $1.20 $22,832.40
4__ Excavation, all classes, for cut-off wall footings, grout caps, and cut-offs. cy. 61 cy... 22.00 1,342.00
11.. Excavation, common, in upstream borrow area and transportation to embankments, over 1,000,000 cy. 112,251 cy. .37 41,532.87
12. .. Excavation, common, in downstream borrow area and transportation to embankment. .39 85,661 cy. 33,407.79
14... Excavation, all classes, in rock source A and transportation to embankment over 183,000 cy. 1.10 21,455 cy. 23,600.50
16__. Excavation, all classes, in rock source B and transportation to embankment, over 430,000 cy. .90 76,033 cy. 68,429.70
21. Special compaction of earthfill.. 3.60 418 cy.. 1,463.00
41.. Furnishing and handling cement. 153 bbl. 4.50 688.50
43_ Concrete in cut-off wall footing and grout caps... 115.5 24.00 cy. 2,772.00
50. Concrete in dam embankment cut-off wall and outlet works stilling basin walls. 14 cy... 55.00 770.00
51.. Concrete in spillway crest structure. 22 cy .. 26.00 572.00
62.. Concrete in highway pavement.. 19.3 cy. 24.00 463.20
OFC No. Excavation of gravel in upstream borrow area “F” 3(c). and transportation to upstream and downstream Zone 2 embankment. 1,332 .67 cy. 769.24
(b) The $213,662.60 given as the consideration for the release consisted almost entirely ($212,319) of retained percentages, d.e., 10 percent of all the contractor’s monthly earnings are retained until he has completed 50 percent of the work (in this case through August 1954), and are paid to the contractor upon completion and acceptance of the project and presentation by him of a certified voucher and, if required, an executed release, all as provided by Article 16 of the contract. The plaintiff contends that the release was void because of unlawful economic duress exercised at a time when he was financially prostrate. Further, that since there was allegedly no valid written contract, any release based on a contract provision would be void.
68. By letter dated November 20, 1956, plaintiff returned his release of that date, together with public voucher, labor standards certification, and executed Order for Changes No. 6, to Bu Bee with the following letter:
*665 Enclosed are the following contract forms, properly executed, covering the construction of Pactóla Dam as submitted to us by you on November 14, 1956:
Form 1034, original, Public Toucher in the amount of $213,562.60.
Certification concerning labor standards for the period ending September 11, 1956.
Order for Changes No. 6, properly executed by us, in the amount of $5,463.30.
Release on Contract, Form No. 7-292, in triplicate copy.
The “Release on Contract”, Form 7-292, has been properly executed by us with thirteen items of exceptions set forth on the release of contract. The exceptions indicated on the release are pursuant to Article 16 of the contract. During our conference in Denver with the various representatives of the Government on November 7, 1956, the officials were advised that exceptions would be set forth, in the release on contract, and we also agreed •that claims in connection with the exceptions to the release. on contract, would be filed immediately. It is our desire to immediately review the government calculations and figures in connection with the contract items excepted in the release, which review may require about fifteen to twenty days, whereupon we will process our claims for all discrepancies discovered. We anticipate processing and filing of our claim or claims on or before March 1,1957. 'We anticipate reviewing the government records immediately and before such records are transferred to the District Office ‘at Huron, South Dakota.
69. On November 30,1956, plaintiff received final payment under, the contract in" the amount of $213,562.60.
70. On August 23,1957, Bu Rec wrote the following letter to plaintiff:
In your letter of November 20, 1956, accompanying the release on contract, you stated that additional data on your claims excepted from the release on contract would be.filed on or before March 1,1957. Since that time I have heard nothing further from you regarding these claims.
In order that we may close our files on this job, I propose to issue findings of fact in approximately 60 days using such information as we have on your claims if the additional data is not filed by that time.
*666 71. On October 17, 1957, plaintiff wrote as follows to Bu Bee:
Your letter dated August 23, 1957 and addressed to our Rapid City, South. Dakota office has been forwarded to our new Englewood, Colorado office.
The checking of the project office figures to prepare our claim for additional compensation in connection with Pactóla Dam, Specifications No. DC-3783, is requiring considerably more time than was originally anticipated. We have discussed the several items within our claim with your office, verbally on three or four occasions since February 1957.
Some of the items of work in question may require assistance from your office and/or engineering assistance because the government project records are not too clear in several instances.
It is our desire to personally discuss some of the records and our findings with your office prior to the submission of our claim on several of the items of work involved; therefore we will greatly appreciate your delaying the issuance of Findings of Fact until the matters can be discussed with you.
72. On February 7, 1958, Bu Bee issued findings of fact and a decision by the contracting officer, which read in part as follows:
1. These findings of fact and decision are issued pursuant to the provisions of Article 15 of the contract identified above.
2. In executing the release on contract dated November 20, 1956, the contractor excepted 13 items of claim totaling $198,633.20. In each of the 13 items, the contractor contended that the quantities included in the final voucher were short. A copy of the release on contract is attached and marked “Exhibit 1.” The executed release on contract was returned by the contractor with a letter dated November 20, 1956, in which he stated that the Government calculations would be reviewed immediately and any discrepancies would be called to the Bureau’s attention on or before March 1, 1957. A copy of the contractor’s letter of November 20,1956, is attached and marked “Exhibit 2.”
3. Having heard nothing further from the contractor on this matter in the meantime, the Government wrote to the contractor on August 23,1957, advising that findings of fact would be issued in 60 days using the informa *667 tion then available. On October 17,1957, the contractor replied to that letter, requesting that issuance of the findings of fact be delayed until details of his claims could be discussed. Accordingly, a meeting was held on November 5, 1957. The discussions held then were inconclusive because the contractor had not completed his data required for detailed study of his exceptions. At the meeting, he did agree that his review of the Government calculations would be completed by the end of November 1957, and that he then would contact the Bureau to arrange an immediate meeting for discussion in detail of his exceptions to the release. To the date of these findings, the contractor has not contacted the Bureau further in regard to his claims, nor has -he furnished any additional information. A copy of the letter of August 23, 1957, to the contractor is attached and marked “Exhibit 3,” and a copy of his letter of October 17, 1957, is attached and marked “Exhibit 4.”
4. As a result of the contractor’s exceptions to the release on contract, the Government has reviewed the computations and has discovered an error in the quantity paid under Item 50, Concrete in Dam Embankment Cutoff Wall and Outlet Works Stilling Basin Walls. The quantity paid on the final estimate under this item was 827.8 cubic yards, whereas the quantity should have been 9.65 cubic yards larger. This quantity of concrete had been placed in the cutoff wall during 1954, and later computations overlooked this 9.65 cubic yards. At the bid price of $55.00 per cubic yard, the contractor is entitled to $530.75 additional payment for Item 50.
5. The computations for all other items listed by the contractor as exceptions to the release on contract have been carefully checked and no discrepancies have been found. Accordingly, it is the conclusion of the contracting officer that all of the contractor’s claims, except that on Item 50, are without a proper basis in fact, and they are hereby denied.
_ 6. In summary, it is found that the contractor is entitled to $530.75 additional compensation on Item 50 of the schedule of Specifications No. DC-3783, and that all other exceptions to the release on contract are without proper basis and they are denied.
73. On March 3, 1958, plaintiff filed a notice of appeal to the findings of February 7,1958, and said, inter alia,:
The Findings are not complete in that they do not give consideration to the extra costs incurred by reason of the *668 overruns in Items 2, 4, 9,11,16,17, 20,21,28, 40, 41, 42, 43 and 44 through 52 inclusive. The total of the additional quantities extended the performance of the contract beyond the period foreseeable at the date of execution. Such quantity increases indicate that the subsurface or latent conditions at the site differed materially from those anticipated by information furnished by the Contracting Officer.
It will be observed that no such claim was excepted from the operation of the release given by plaintiff on November 20, 1956 (finding 67, supra). Of the items mentioned by plaintiff in its notice of appeal, nothing in the release excepted any claim in connection with Items 2 (Excavation, overburden), 9,17, 20, 23, 40, 42 or 44 through 49. Furthermore, as to items excepted from the operation of the release, the only exception was as to the accuracy of the quantities for which plaintiff had been paid. There was in the release no reservation of a claim for extra costs by reason of overruns or because of any extended performance period. In its appeal, plaintiff did not cite any claim as to Item 3 (Excavation, all classes, in open cut), or any claim as to misclassification of excavation.
74. The following letter dated March 20,1958, was sent by Bu Eec to plaintiff:
This will acknowledge receipt of your letter of March 7, 1958, with Notice of Appeal to the Findings of Fact dated February 7,1958, m the matter of the above claim. The Notice of Appeal will 'be forwarded to the Board of Contract Appeals.
A brief study of your appeal indicates your desire to review the project records and set forth in detail the points of alleged error on which you are basing your claims. It is agreed that any areas of alleged error should ■be delineated so that the hearings may be as brief and effective as possible.
As regards Particulars I and III of your notice of appeal, the findings do not allege lack of diligence, as you find apparent, but only record and refer to correspondence and discussion pertinent to the claims. As recited in the findings, your letter of November 20, 1956, Exhibit 2, indicated that you immediately would review the final estimate calculations, and that you intended processing your claim on or before March 1, 1957. You obtained *669 copies of the project data for that purpose. By letter of August 23,1957, Exhibit 3, you were reminded that your specific claims had not been received. Pursuant to your request of October 17, 1957, Exhibit 4, a meeting with you was arranged on November 5,1957.
At that meeting, you stated that your review of the Government calculations would be completed by the end of November 1957, and that you would then contact this office to arrange an immediate meeting for discussion of details of your claims. You were assured at that meeting that every possible assistance in interpretation of the records would be given. All of the data were brought immediately to this office, reviewed, and arranged for ready reference at the proposed meeting.
When no communication was then received from you, you were reminded by telephone on various occasions, most recently on January 16, 1958, that all data were here for inspection, that assistance was available, and that this office desired to conduct the review at the earliest possible time. The project data have been here since mid-November 1957, and assistance has been at hand since that time. Inasmuch as the man who was 'Construction Engineer on Pactóla Dam could not be held indefinitely for consultation with you, it became necessary to issue the findings based on the information then available.
It has been the desire and intention of the Bureau to meet with you and aid in every way to check, specifically, points of disagreement. If you wish assistance and a cooperative review of the calculations, will you please communicate with this office to arrange a meeting for that purpose in the immediate future. Assistance will be readily available until about May 1,1958, except for the week of March 30 to April 5.
.In the event that any errors in the calculations are discovered by our mutual efforts, in the period allowed by the Board of Contract Appeals for your filing of a brief, the findings will be revised, or reissued, to reflect any corrections that may be found to be justified.
[Note: As to the foregoing letter, plaintiff contends that by failing to complain that plaintiff’s claim was improper because it exceeded the releases of July 6, 1956 and November'20, 1956, the contracting officer thereby waived reliance on the releases and waived objection to plaintiff’s right to assert a changed condition belatedly.]
*670 75. Pursuant to the Government’s invitation as noted in the preceding finding, Adler, accompanied by an engineer employed by him, one Thomas Zolper, arrived at the Bureau’s offices in Denver on Tuesday, April 15,1958. Thereafter, for the balance of the workweek, conferences were held between Adler and the Bureau engineers and measurements were made by Adler, Zolper and the construction engineer, Goehring, from the project construction records. All of the contract items cited in the exceptions to plaintiff’s release of November 20, 1956, were studied and there were no errors found in the Government’s measurements as to Contract Items 3 (Excavation, All Classes, in Open Cut), 12,14,41 and Order for Changes No. 3, and those items were deleted from plaintiff’s claims. The construction engineer, in a memorandum of the conference written May 1, 1958, says that he believed plaintiff’s claim under Contract Item 51 had been similarly deleted (ibid.) and no claim under that item is prosecuted here. It is not entirely clear from the contemporaneous memorandum, but it is reasonable to construe that plaintiff did not object to the deletion of his claims for Items 3,12,14, 41 and 51, and Order for Changes No. 3, seemingly convinced by the Government’s proof.
Errors in the Government’s quantity measurements were found by the conferees in Items 11 and 16 as well as 50, the error in which had previously been corrected by the findings of fact of February 7,1958. In Item 11, an arithmetical error had resulted in payment to Adler for some 13,719.2 cubic yards less than actually excavated, entitling him to a further payment for that item of $5,076.10. A similar error in Item 16 of 3,863.1 cubic yards entitled Adler to further payment of $3,476.79.
Disposition of these claims in the fashion above indicated left only four of the exceptions to the release Adler gave as to which no agreement had been reached at the end of the conference. These were Adler’s exceptions to Items 4 (Excavation, All Classes for cutoff wall footings, grout caps and cutoffs), 21 (Special compaction of earthfill), 43 (concrete in cutoff wall footings and grout caps) and 52 (concrete in highway pavements).
*671 76. Following the four days’ conference, above described, Government engineers thought that Adler’s claims on the four items not resolved (i.e., 4, 21, 43 and 52) might have some merit and the “records and computations were studied again with a view to finding justifiable reasons and quantities for payment”.
As a result, the Bureau decided to allow Adler 46.6 more cu. yd. on Item 4 than he had been paid for. At the time of the conference Adler was seeking payment for only 43.3 cu. yd., which at $22 per yard came to $952.50. The Bureau’s allowance was somewhat larger, $1,025.20.
Adler’s claim for special compaction of earthfill in the amount of 418 cu. yd. was allowed in full in the amount of $1,463.
Adler, who in his Belease and at the conference, claimed he was entitled to payment for an additional 115.5 cu. yd. of grout cap concrete (Item 43), claimed only an additional 43.3 cu. yd. of grout cap excavation. The engineers were unable to see how Adler could claim so much more concrete fill than he had excavation. Study of batch counts led to an allowance of 48.1 additional cu. yd. of concrete to fill the void left by the extra excavation allowed (46.6 cu. yd., see supra), and in addition the Bureau found that another 37.5 cu. yd. had not been paid for. This led to an allowance on Item 43 of 85.6 additional cu. yd., warranting payment of an additional $2,054.40.
Adler’s exception on the release of 19.3 additional cu. yd. of “concrete in highway pavement” (Item 52) was allowed in full.
77. Under date of November 14, 1958 (mailed to plaintiff January 29, 1959), the contracting officer issued supplementary findings of fact which discussed plaintiff’s exceptions to its release and concluded (except for the pro forma paragraph as to right of appeal) as follows:
9. As a result of the review of the data, no errors or irregularities were found in the calculations for final payment for Items 3, 12, 14, 41, 51, and Order for Changes No. 3.
10. In his notice of appeal, dated March 3, 1958, the contractor requested an adjustment because the large *672 overruns in several of the major items of the job forced the work to continue for a longer period than had been originally planned. A copy of the contractor’s appeal of March 3,1958, is attached and marked “Exhibit 2.” The release on contract, copy of which is attached and marked “Exhibit 3,” did not reserve such a claim. The contractor’s failure to except this claim from the operation of the release on contract precludes my considering the claim, and it is therefore denied.
11. In summary, it is found that the contractor is entitled to the following additional compensation on Items 4, 11, 16, 21, 43, and 52 of the schedule of Specifications No. DC-3783:

Item Quantity Price Amov/nt

4.46.6 cu yd.$22.00 $1,026.20
11.13,719 cu yd. 0.37 6, 076.03
16. 3,863 cu yd. 0.90 3,476.70
21.418 cu yd. 3.60 1,463.00
43. 85.6 cu yd. 24.00 2,064.40
52.19.3 cu yd. 24.00 463.20
$13, 558.53
The Findings of Fact dated February 7, 1958, showed that the contractor was entitled to $530.75 under Item 50 of the schedule of the specifications. Thus, it is found that the contractor is entitled to a total of $14,089.28 additional compensation. All other exceptions to the release on contract are found to be without proper basis and they are denied.
78. On January 30,1959, plaintiff wrote the following letter to Bu Bee:
We hereby acknowledge receipt of your letter dated January 29, 1959, in which you transmitted the 'Supplemental Findings of Fact and Decision dated November 14,1958, in connection with the above named contract.
Please be advised that we hereby accept said Supplemental Findings of Fact as satisfactory settlement of all claims under the afore-mentioned contract except as follows:
We reserve all the rights in connection with our claim as outlined in Paragraph IV of our Notice of Appeal dated March 3, 1958, m which we claimed additional compensation for increased costs on the items stated therein, because these additional quantities extended the performance of the contract beyond the period foreseeable at the date of its execution.
Accordingly, we do not accept Paragraph 10 of the afore-mentioned Supplementary Findings of Fact and
*673 Decision dated November 14", 1958, and a formal Notice' of Appeal therefrom will be filed at a later date.
79. Subsequently, on February 28, 1959, plaintiff filed a timely appeal with the Interior Department’s Board of Contract Appeals. On January 4, 1960, in ibca-156, the Board sustained the Government counsel’s contested motion to dismiss, the appeal on the ground that the claims presented by Adler “sound either in misrepresentation or call for recovery of unliquidated damages,” over which the Board had no jurisdiction. Thereupon, plaintiff filed the instant petition in this court on August 31, 1960.
80. Plaintiff’s desperate financial status continued unabated through 1956,1957, 1958, and thereafter (see finding 61, supra). The $213,562.60 he received as final payment on November 30,1956 was applied to pay off about 120 suppliers and smaller creditors to avert Miller Act suits, leaving unpaid four or five larger creditors, including loans from the bonding company and the bank. For example: in November 1957 Texas Company sued Adler for $87,291.86; and in 1957 Dupont Company sued him for $50,673.78 for explosives; he owed the bonding company over $155,000, and the bank over $182,000. On the occasion of each of the successive releases to Bu Rec plaintiff was deeply in debt to his creditors and they were pressing for payment. In 1958 he sold virtually all his eqiiipment at auction in order to meet unpaid bills. It was stipidated by the parties that plaintiff’s total loss in perform > ing the contract was not less than $285,833.23. This figure does not include plaintiff’s additional claims, for costs related to depreciation, inventory depletion, partners’ salaries, some overhead, interest on borrowings, and certain additional labor costs.'Nor does it include additional, claims for unliquidated damage costs for changed conditions, work acceleration, and misrepresentation. Plaintiff’s financial position was such that, at the completion of the job, he was unable to obtain performance bonds to undertake other contracts.
81. Voluminous evidence was taken, and requested findings and briefs filed, on the issue of damages, but these findings intentionally omit reference to the damage issue because of *674 disposition of the liability issue as described in the accompanying opinion.
CONCLUSION OE LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 Considering the time and expense involved in this lengthy litigation, it is regrettable that the parties did not fully explore the release issue by a dispositive motion at a much earlier stage, ajs was suggested by the trial commissioner’s letter of March 6, 1961.

 On March 29, 1968, the court entered an order denying plaintiff’s motion for reconsideration of the court’s order of July 2, 1964. On that date the court had entered an order dismissing that portion of plaintiff’s claims which sought equitable relief pursuant to a reference from Congress under the provisions of 28 U.S.C. § 2509, prior to the amendment of that statute on October 15, 1966. The order of March 29, 1968, stated that plaintiff’s motion be and the same is hereby denied, without prejudice to plaintiff’s right to geek a congressional reference of its claims to the Chief Commissioner of the Court of Claims pursuant to 28 U.S.C. § 2509, as amended October 15, 1966, and if successful in obtaining such a reference to move for dismissal of this action without prejudice. [Footnote by the court.]

The court has reviewed and rejected the significant exceptions plaintiff has taken to the trial commissioner’s findings with respect to the matter of the releases. In view of the disposition of the case, the court has not undertaken the academic task of passing upon plaintiff’s minor and insignificant exceptions with respect to the matter of releases, or its exceptions with respect to the changed conditions, the exact extent of the errors in its original bid, and other matters not pertinent to the subject of the releases. The defendant filed no exceptions and must therefore be taken to acquiesce in the findings. [Footnote by the court.]

 The conflicts between the two versions are not momentous.

 The ten-day period commenced to run October 9, 1952, when the contract and bond forms had been sent to Adler for execution.

 Zone 1 material is compacted silt, clay, sand and gravel. Zone 2 material is compacted rock fines. Zone 3 material is layered rock fill. Basically, the Zone 2 material is sandwiched schematically between a Zone 1 core and a Zone 3 exterior to form the earth dam.

 In layman’s terms, the cutoff trench is a fairly shallow trench of 150' designed maximum width which is cut out of the dam foundation, although in this case the considerable irregularity of the rock in the cutoff trench area obviated the need for the excavation of an actual trench. In the General Plan View in Drawing 39, the cutoff trench viewed from above is roughly arcuate in shape (i.e., bow-shaped, banana-shaped, or boomerang-shaped, as the eye persuades), spanning the upstream side of the dam axis and dwindling in width as it ties in to the ascending abutments on either end of the dam axis. A concrete cutoff wall, in which are embedded at intervals a number of hollow grout pipes which extend downward some distance into the underlying rock, is constructed through the center length of the cutoff trench. Grout (concrete of a soupy consistency) is forced under pressure through the hollow grout pipes so as to fill and solidify subterranean rock fissures, the object being to create a solid barrier to the permeation of water which, if not blocked, might weaken the dam.

 A preliminary geologic report prepared by Bu Rec in 1951 reports that the overburden in the valley floor at the main damsite averages about 10'.

 Not necessarily root, since tiie main dam embankment was designed to rest on suitable material other than rock outside of the cutoff trench, and the drill logs could not be interpreted to disclose at what level such suitable material would be encountered.

 Drill logs available to bidders did not advise as to depth of overburden or top of rock, although Government data not available to plaintiff contained this data.

 As plaintiff analyses these drawings, while the data with respect to original ground surface and ultimate excavation elevations are ostensibly the most reliable evidence of these facts, the drawings provide only fragmentary records of monthly progress, even though progress payments for excavation were supposedly based on these drawings each month. The inconsistency is without explanation. Moreover, as to approximately 32 percent of the dam area the ultimate excavation lines are in pencil, indicating that they are not final.

 Excavation and fill for the main dam represented 83 percent of the overall total.

 The Schedule covered 70 Items, all but three of which were to be paid at unit prices.

 Excavation overruns are not an undiluted misfortune, and often are beneficial to the contractor who correctly computes his unit costs to allow a proper profit which may then be multiplied to his advantage by overruns. The basic problem in plaintiff’s case was that the overruns occurred under extraordinarily difficult subsurface conditions which ran up his costs by impairing the efficiency of his operations.